**FIRST NATIONAL BANK IN CLARKSVILLE, Appellant,**

v.

**R. L. MOORE, Appellee.**

No. 8958.

Court of Appeals of Texas, Texarkana.

Jan. 26, 1982.

Rehearing Denied Feb. 16, 1982.

Hubert D. Johnson, Johnson & Cravens, Dallas, for appellant.

Pat C. Beadle, Beadle & Beadle, Clarksville, for appellee.

CORNELIUS, Chief Justice.

This is an appeal by the First National Bank in Clarksville from a take nothing judgment rendered in its suit against R. L. Moore seeking to recover the amount of two dishonored checks.

The checks were given in connection with the business of Texas Continental Express, Inc., a trucking enterprise located in Euless, Texas, owned and operated by Moore's two sons, Rocky and Mike. Moore was not affiliated with the corporation and had no interest in it, although he did own a trucking operation in Clarksville operating as Trans-Continental Express, Inc. At the time of the events in question, Trans-Continental banked with the First National Bank in Clarksville and the Red River Bank, and Texas Continental banked primarily with the National Bank of Commerce in Dallas.

Thomas Reep, president of First National Bank in Clarksville, testified that R. L. Moore approached him in June of 1976, and requested that the bank allow his sons, Rocky and Mike, to open an account in the bank in the name of Texas Continental Express, Inc. The evidence relied upon by the Bank to establish an agreement or understanding between it and Mr. Moore was the following testimony by Mr. Reep:

"Mr. R. L. Moore came to me and asked me if I would let his sons open an account in our bank in the name of Texas Continental Express, Inc. I told him that I would. He gave me these conditions: he said that he would have several accounts in the bank that would more than amount

to more business than they were going to be doing with our bank, more dollars, and he offered this as compensation to our bank for handling the business, and he told me that anything that came up, all I had to do was contact him personally, nobody else, and I told him that I would under those conditions, and that was the arrangement that was originally set up."

On cross-examination Mr. Reep further testified as follows:

"Q. Was there any explanation as to why the draft handling arrangement was not being handled in Dallas, rather than here or in that area near Euless?

"A. Yes, it was. Mr. Moore told me at the time he wanted this done that he wanted to oversee and see that the boys were doing a good operation, and he wanted to make sure everything was on the up and up. They had had problems in the past, and he wanted to make sure that he could take care of it."

The bank proceeded to furnish regular checking account and bank draft services for Texas Continental. In its draft services the bank would pay drafts written on Texas Continental by other parties, accepting Texas Continental's checks on the National Bank of Commerce as payment. About a year before the trial of this suit, one of the checks drawn by Texas Continental on the National Bank of Commerce was returned to the bank in Clarksville because of insufficient funds. At that time Mr. Reep went to R. L. Moore's home and informed him of the problem. Moore called one of his sons and "gave them a royal eating out", according to Mr. Reep. The next day Moore telephoned Reep and told him his check would be covered.

On April 8 and 9, 1980, Texas Continental paid drafts at the First National Bank in Clarksville by two checks written on the National Bank of Commerce totaling $448,942.05. Both of those checks were returned to the First National Bank in Clarksville because of insufficient funds. The first check for $315,413.86 was returned to the bank in Clarksville on Friday, the 11th of April. On that day Mr. Reep attempted to contact Moore, but was unable to do so. He then talked to Rocky Moore. On the following Sunday Mr. Reep contacted R. L. Moore and was told by him that "I don't know what I can do ... I'm going to do something about it ... my son is not going to beat anybody." The following Tuesday R. L. Moore called and told Mr. Reep that the $315,413.86 check was covered. Reep then received a call from a banker with the National Bank of Commerce in Dallas who assured him that Moore and his sons had been at the bank and that everything had been taken care of, and that First National's account would be credited the following morning. Subsequently, however, Mr. Reep called the bank to inquire why the account had not yet been credited, and he was told that Mr. Moore's wife suffered a nervous break-down the night before and that "the deal is off." The banker then informed Reep that the second check for $133,528.19 would also be returned insufficient funds. Neither of the checks was ever paid.

The Clarksville bank brought suit against Moore on his alleged promise to hold the bank harmless from risks or losses in the draft handling services for Texas Continental. Moore defended on the grounds that he made no such agreement, and further that if he had made such an agreement it would be unenforceable because of the Texas Statute of Frauds.[1]

Trial was to a jury which found that:

1. R. L. Moore agreed to make good any losses the bank in Clarksville might incur from receiving dishonored checks from Texas Continental in the draft handling service.

---

1. Texas Bus. & Com.Code Ann. § 26.01 (Vernon 1968):

"Promise or Agreement Must be In Writing
"(a) A promise or agreement described in Subsection (b) of this section is not enforceable unless the promise or agreement, or a memorandum of it, is
"(1) in writing; and·

"(2) signed by the person to be charged with the promise or agreement or by someone lawfully authorized to sign for him.
"(b) Subsection (a) of this section applies to

. . . . .

"(2) a promise by one person to answer for the debt, default, or miscarriage of another person; ..."

2. R. L. Moore made the agreement in consideration of the bank's promise to provide the draft handling services for his sons.

3. The consideration that Moore received was a benefit accruing directly to him.

4. The benefit to R. L. Moore was not his main purpose in making the promise.

Moore moved the court to disregard the first three jury findings and to render judgment for him. The bank moved to disregard jury finding number 4 and render judgment for it. Moore's motion was sustained on the basis that there was insufficient evidence to raise or sustain findings 1, 2, and 3.

The bank has assigned four points of error which assert that the evidence was sufficient to sustain the jury's answers to special issues 1, 2, and 3 and that those findings, together with other undisputed facts, conclusively established its right to recover, despite the adverse jury finding in issue number 4. The points will be overruled and the judgment affirmed.

■ There has been considerable confusion generated by the decisions concerning promises which are not within, or which constitute exceptions to, the Statute of Frauds. It has been variously stated that there are three tests to determine if a promise is enforceable notwithstanding the Statute. They are:

1. Did the promissor intend to become primarily liable for the debt, in effect making it his original obligation, rather than to merely become a surety for the original obligor?

2. Was there consideration for the promise?

3. Was receipt of the consideration the promissor's main purpose or leading object in making the promise?

*Haas Drilling Co. v. First National Bank in Dallas,* 456 S.W.2d 886 (Tex.1970); *Cooper Petroleum Co. v. LaGloria Oil & Gas Co.,* 436 S.W.2d 889 (Tex.1969); *Gulf Liquid Fertilizer Co. v. Titus,* 163 Tex. 260, 354 S.W.2d 378 (1962); 26 Tex.Jur.2d *Frauds, Statute of* §§ 15, 18 and 19 (1961); 2 A.

Corbin, Contracts § 366 (1950); Restatement (Second) of Contracts § 184 (Tent. Draft nos. 1–7, 1973). Tests 1 and 3 are closely related and actually overlap in their essential elements. In reality there are only two tests: if the promise is to become primarily liable for the debt, it is not within the statute and is enforceable as any other promise if it is supported by consideration. If the promise is collateral, i.e., one of surety, it still may be enforced if there is consideration for the promise and if that consideration was the main purpose or the leading object for the making of the promise.

■ We find there was some evidence to support the jury's answers to special issues 1, 2, and 3, but because the Bank failed to secure a jury finding that Moore's agreement was a primary undertaking rather than a collateral one, or that the main purpose of the agreement was to obtain a benefit to himself, the attempt to bring the promise out of the statute's prohibition failed.

■ The bank argues, however, that it was entitled to recover on the basis of promissory estoppel. There is a division of opinion in the United States as to whether promissory estoppel alone is sufficient to take a promise out of the operation of the Statute of Frauds. Some decisions hold that it may be sufficient if the traditional elements of promissory estoppel are present. See Annot., 56 A.L.R.3d 1037 (1974). Other decisions require that in addition to the elements of promissory estoppel, there must also be an ancillary promise that the statute has been or will be satisfied, i.e., that a sufficient writing either has been or will be executed. See *"Moore" Burger, Inc. v. Phillips Petroleum Company,* 492 S.W.2d 934 (Tex.1972); *Cooper Petroleum Co. v. LaGloria Oil & Gas Co.,* supra; *Retama Manor Nursing, Etc. v. Cole,* 582 S.W.2d 196 (Tex.Civ.App.—Corpus Christi 1979, writ ref'd n. r. e.); *H. Molsen & Co., Inc. v. Hicks,* 550 S.W.2d 354 (Tex.Civ.App. —El Paso 1977, writ ref'd n. r. e.); Annot., 56 A.L.R.3d 1037 (1974). The only Texas

case we have discovered allowing promissory estoppel to defeat the statute absent the existence of an ancillary promise is *Texarkana Constr. Co. v. Alpine Constr. Specialties, Inc.,* 489 S.W.2d 941 (Tex.Civ.App.— Texarkana 1972, writ ref'd n. r. e.), and the decision there did not really rest upon promissory estoppel, because the court also found a satisfaction of the main purpose rule. Even if we were to apply promissory estoppel in this case, reliance on the part of the bank, which is an essential ingredient, has not been conclusively established. There is evidence from which it can be inferred that the bank, in advancing the money, did not rely upon the promise of Moore to stand good for his sons' losses, but rather did so in order to get and keep R. L. Moore's banking business. As the issue of reliance was not established conclusively and the bank failed to secure a favorable jury finding on it, the court properly refused to render judgment upon that theory.

For the reasons stated the judgment of the trial court is affirmed.

