**COMPUTER SYSTEMS OF AMERICA, INC.**

v.

**INTERNATIONAL BUSINESS MACHINES CORPORATION and St. Regis Paper Company.**

Civ. A. No. 80–2378–Z.

United States District Court, D. Massachusetts.

Aug. 11, 1983.

Rowe W. Snider, Friedman & Koven, Chicago, Ill., for plaintiff.

William H. Baker, Nutter, McClennen & Fish, Boston, Mass., for defendant IBM Corp.

Molly S. Boast, LeBoeuf, Lamb, Leiby & MacRae, New York City, for defendant St. Regis.

## MEMORANDUM OF DECISION

ZOBEL, District Judge.

Plaintiff Computer Systems of America, Inc. ("CSA") brings this diversity action against St. Regis Paper Company and International Business Machines Corporation ("IBM") to collect damages for a business deal which fell through in 1979. Specifically, CSA claims that St. Regis broke an agreement to lease a computer for its Dallas facility and that IBM was the reason why the transaction turned sour. Counts I and II of the complaint against St. Regis allege breach of contract and promissory estoppel, respectively. Counts III and IV against IBM allege interference with contractual relations and interference with a prospective business relationship. St. Regis and IBM move for summary judgment on all four counts. The depositions of

those involved in the transaction and relevant documents pertaining to it are all before the Court.

## UNDISPUTED FACTS

In 1977, St. Regis first embarked on its search for a computer, the IBM 3033, to install in its data processing facility in Dallas. That April, it placed an order with IBM to lease the computer, but demand was decidedly greater than the supply: St. Regis' delivery date, assigned by lottery, was September 1979. It requested an improvement in the date, but by the fall of 1978, none had been granted and St. Regis began looking for other companies from whom to lease the computer. Although St. Regis and IBM had a written contract for the lease, St. Regis' search elsewhere had IBM's blessings.

In February 1979, Robert Anderson, CSA's representative in its Houston office, contacted St. Regis' man in Dallas about leasing a 3033 from CSA. CSA, in line to buy a 3033 from IBM, had a delivery date for its equipment of mid-May that year, several months earlier than St. Regis' delivery date in September. On April 5, Anderson and Benjamin Harrison, CSA's vice president of marketing in Boston, had lunch in Dallas with two St. Regis representatives, Fred Wolfe and Edwin Meuhlhause. They discussed the monthly rental of the computer and the length of the lease among other things; Wolfe was provided a CSA standard form lease dated November 1978 as a sample. On April 19 and 20 in conference calls between Dallas, Houston and Boston, Anderson, Harrison and Wolfe talked again. It is undisputed that they agreed to a monthly rent, a July 15 beginning for the lease, and a lease term of 48 months. In addition, both Harrison and Anderson say St. Regis agreed to daily or "precommencement" rent accruing from an installation date of May 18 to July 15, but payable in July. St. Regis disputes that.

Before the conversations ended, Harrison told Wolfe that he needed a letter from St. Regis stating that it would lease the computer from CSA "subject to contracts being acceptable to both parties." Wolfe discussed the substance of the letter with Harrison, who gave his approval. On April 23, Wolfe sent the letter, which states: "Confirming our conversation of Friday, April 20, we propose to lease for a four-year term a 3033–U8 with 12 channels at a monthly rate of $66,805. This lease is dependent upon satisfactory contractual arrangement." The letter did not mention precommencement rental, the beginning date of July 15 for the lease, or the standard form lease CSA had given St. Regis earlier. The parties knew that the deal had to be reviewed by St. Regis' New York office and proceed through both companies' documentation departments, but neither anticipated any problems.

Problems, of course, did arise. On May 4, Anderson in Houston raised the subject of precommencement rental in a telephone call to Wolfe in Dallas. Wolfe expressed surprise and disappointment; he said that he had not understood that to be part of the deal. Up to this point, attorneys for both companies had exchanged drafts of the proposed lease and negotiated over specific provisions. CSA had already informed IBM that St. Regis would be the recipient of the computer it had on order, and it had taken steps toward the installation and modification of the equipment which was on its way to Dallas. In the May 4 conversation, however, Wolfe said that the precommencement rental would "affect management's position" and CSA for the first time sensed that the transaction might not go through as planned.

## DISPUTED FACTS

In the meantime, IBM had managed to improve the September delivery date for the computer St. Regis had ordered in 1977. On April 30, following CSA's notification to it that St. Regis was to get CSA's computer, IBM offered St. Regis delivery in late June on the 1977 order. The evidence is inconclusive as to how, why or under what circumstances this particular change was made. The IBM representative in Dallas assigned to handle St. Regis'

account says that he did not know of the change until May 10—a claim which CSA finds incredible. That same day, he went to St. Regis' office in Dallas to inquire if the company wanted to cancel its order to lease directly from IBM. When told "no," he informed St. Regis of the improvement in delivery dates. The St. Regis man said that his company and CSA were "getting further and further apart" and asked the IBM man to confirm the improvement date, which he did. On May 11, St. Regis formally terminated its negotiations with CSA.

## LEGAL CONCLUSIONS

■ I note initially that, because of certain undisputed facts, Texas law governs the contract, estoppel and tort claims. All three companies have offices in Texas and all relevant telephone conversations were to or from Dallas and/or Houston. The April 5 luncheon meeting at which a lease was discussed occurred in Dallas, and the April 23 letter was written from there. The 3033 computer was to be installed at the Dallas facility, and the conversations between IBM and St. Regis which gave rise to the tort claims took place there. Under either a traditional or a functional approach to conflicts law, Texas is the point of most contact and the center of all relevant activity. Applying Massachusetts conflicts rules (*see Klaxon Co. v. Stentor Elect. Mfg. Co.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941)), I find that Texas law should be used to resolve all substantive issues in the case.[1]

### 1. *Claims against St. Regis*

St. Regis makes three arguments in support of summary judgment on Count I alleging breach of contract. First, it says that there was no contract because there was no agreement on its essential terms. Second, it contends that even if there were agreement on all terms, the contract was conditioned upon the execution of a written document. Finally, St. Regis argues that any contract which did exist is not enforceable under the statute of frauds.

In regard to the first argument, there is a clear dispute of fact as to whether the parties at any time were in agreement on all major items. Although Wolfe said on May 4 that he did not understand that precommencement rental was part of the deal, CSA witnesses testified that the term had been discussed at length the preceding month and met with St. Regis' approval. That St. Regis later denied that it had agreed does not change the fact that there was at one time a "meeting of the minds" if CSA's version is accepted. Whether parties to a purported contract agree on all essential terms is a question of fact for the jury. *Calvin V. Koltermann, Inc. v. Underream Piling Co.,* 563 S.W.2d 950 (Tex. Civ.App.1977), *writ ref'd n.r.e.* Summary judgment on this ground is therefore inappropriate.

■ I am persuaded by St. Regis' second argument, however. The April 23 letter said that the lease was "*dependent* on satisfactory contractual arrangement." (emphasis supplied). "The language used

---

1. Certain Massachusetts cases have applied the Massachusetts statute of frauds to contracts formed elsewhere, holding that the statute is procedural in nature and that the forum state uses its own rules of procedure. *See, e.g., Emery v. Burbank,* 163 Mass. 326, 39 N.E. 1026 (1895); *see also Porter v. Reid,* 79 F.Supp. 898 (D.Mass.1948) (applying Massachusetts conflicts rules). However, in all of those cases, the Massachusetts statute made unenforceable in Massachusetts and thus contrary to the forum's policy contracts which were valid where made. To the extent it makes any difference whether Texas or Massachusetts law is applied in this case, Massachusetts is more liberal both in its requirement of what amounts to a satisfactory writing and in

its rules as to how noncompliance with the statute affects a promissory estoppel claim. Massachusetts law would therefore *allow* claims which would *not* succeed in Texas. The cases *disallowing* claims because of the Massachusetts statute are thus distinguishable. *See McKinney v. Nat'l Dairy Council,* 491 F.Supp. 1108, 1111 (D.Mass.1980) (using similar reasoning to apply the statute of frauds of the state where the contract was made instead of the Massachusetts statute). Besides, it would make little sense to apply the law of different states to issues so closely related as contract, estoppel, and the statute of frauds to come up with a result that *no* state would reach if only its law were applied.

by the parties should be accorded its plain meaning in order to arrive at their intention when the instrument was drafted." *Smith v. Sabine Royalty Corp.*, 556 S.W.2d 365, 368 (Tex.Civ.App.1977). Moreover, CSA's own witness, Harrison, admitted that he wanted the letter written so that St. Regis would commit itself to lease the computer from CSA *subject to* a written contract being acceptable to both sides. Lengthy negotiations over the terms of the written document followed the April 20 meeting; both parties clearly contemplated the execution of a formal lease and obviously did not feel so bound that they could not continue to negotiate. Because any agreement was made expressly contingent on a written lease which was never executed, no contract existed. Although no one anticipated any difficulty in settling on a contract satisfactory to all, that does not change the fact that neither party was bound until and unless the condition to which both agreed was met. I therefore grant St. Regis' motion for summary judgment on Count I.[2]

---

**2.** An alternative ground for summary judgment is St. Regis' third argument that the statute of frauds was not satisfied. The Texas statute is applicable because the lease term is greater than one year. Tex.Bus. & Com.Code Ann. § 26.-01(b)(6) (Vernon 1968). To satisfy the statute of frauds, the writing must contain some acknowledgement that a contract exists as well as all of its essential terms. *Boddy v. Gray*, 497 S.W.2d 600 (Tex.Civ.App.1973), *writ ref'd n.r.e.;* 2 *Corbin on Contracts* § 517 (1960). The April 23 letter has neither. As already noted, it expressly conditions a contract on the execution of a written document. And it does not mention precommencement rental or the July 15 beginning date for the lease—both essential terms. Plaintiff contends that the standard form lease given to Wolfe on April 5 supplements the letter to supply the missing terms. But under Texas case law, an unsigned writing can be so used only *if the signed document* makes some reference to it. *See, e.g., Owens v. Hendricks*, 433 S.W.2d 164 (Tex.1968). There is no such reference in the April 23 letter.

**3.** Even if a contract arose without execution of a written lease, the statute of frauds provides an alternative basis for summary judgment here just as it did on Count I. *See* n. 2 *supra.* Under Texas law, a plaintiff's failure to comply with the statute precludes him from relying on estoppel *unless* there is an additional promise by defendant that he will sign a writing which

Summary judgment on Count II follows from my decision on Count I. Promissory estoppel does not create a promise where none existed before; rather, it prevents the defendant from denying the enforceability of obligations which would otherwise be barred at law. *Weitzman v. Steinberg*, 638 S.W.2d 171, 176 (Tex.Civ. App.1982) (estoppel inapplicable to agreement to enter into future negotiations). St. Regis promised to rent the computer from plaintiff *if* a written lease satisfactory to both parties was executed. Estoppel cannot convert this conditional promise into an unconditional one.[3]

## 2. Claims against IBM

Because no contract took effect between CSA and St. Regis, Count III accusing IBM of interfering with contractual relations goes out as well.[4] The existence of a contract is an essential element of the claim. *Tidal Western Oil Corp. v. Shackelford*, 297 S.W. 279, 280 (Tex.Civ.App. 1927). As to Count IV alleging interference with prospective business relations,

---

would have satisfied the statute. *"Moore" Burger, Inc. v. Phillips Petroleum Co.,* 492 S.W.2d 934 (Tex.1972). *See also Nagle v. Nagle,* 633 S.W.2d 796, 800 (Tex.1982); *First National Bank in Clarksville v. Moore,* 628 S.W.2d 488, 491 (Tex. App.1982), *writ ref'd n.r.e.* Making the transaction "dependent on satisfactory contractual arrangement" does not amount to such a promise. Some Texas cases indicate that even without a promise to make a writing, plaintiff's noncompliance with the statute of frauds will not bar an estoppel claim if defendant has been unjustly enriched. *See, e.g., Central Power & Light Co. v. Del Mar Conservation District,* 594 S.W.2d 782 (Tex.Civ.App.1980), *writ ref'd n.r.e.* (oral contract partially performed by plaintiff may be enforced in equity if denial of enforcement would amount to a "virtual fraud.") However, it is difficult to see how St. Regis reaped an unearned benefit by breaking any alleged agreement with plaintiff.

**4.** If the contract were simply unenforceable under the statute of frauds, Count III would remain. The unenforceability of an oral contract between parties is not available as a defense to a third party accused of tortiously interfering with the contract. *Clements v. Withers,* 437 S.W.2d 818 (Tex.1969). *See also Restatement (Second) of Torts* § 766 comment f (1979).

IBM makes three arguments in support of its motion for summary judgment. First, it contends that it did not have the requisite knowledge and intent to be liable for tortious interference. Second, it claims that its actions were justified as the fulfillment of its own contractual obligations to St. Regis and in the spirit of free competition in an open marketplace. Finally, IBM argues that its conduct did not cause St. Regis to break off negotiations with plaintiff.

In resolving these questions, I keep in mind the stringent standards of Rule 56. Summary judgment is appropriate only "where it is quite clear what the truth is." *Sartor v. Arkansas Natural Gas Corp.,* 321 U.S. 620, 627, 64 S.Ct. 724, 728, 88 L.Ed. 967 (1944). All proffered proofs must be viewed in the light most favorable to the party opposing the motion. *Adickes v. S.H. Kress and Company,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). The movant has the burden of showing the absence of any triable issue of material fact, even as to those issues upon which the opposing party would have the burden of proof at trial. 6 *Moore's Federal Practice* ¶ 56.23 at 1389–1390 (2d ed. 1982). *See also Bromley-Heath Modernization Committee v. Boston Housing Authority,* 459 F.2d 1067 (1st Cir.1972). Finally, summary judgment is particularly inappropriate in cases where motive, intent and justification are important. *See Poller v. Columbia Broadcasting System,* 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962). They inevitably involve credibility questions properly resolved at trial.

Applying these principles to the instant case, I conclude that a genuine issue of material fact exists as to each of the arguments IBM makes. There is certainly evidence that it knew of negotiations between CSA and St. Regis: as of late April, IBM personnel were on notice that St. Regis was to get CSA's computer on order from IBM, indicating that a contract was either in existence for its lease or about to come into being. IBM points out that its representative in Dallas says he did not inform St. Regis until May 10 that it had gotten an improvement of delivery dates and that he was informed that negotiations with CSA were breaking down. However, the change in delivery dates actually occurred in late April so that St. Regis could conceivably have been told before May 10. Moreover, whether his account is believed is a question for resolution at trial, not on summary judgment. Finally, IBM argues that there is no evidence that it changed delivery dates in order to disrupt the transaction between CSA and St. Regis. But IBM has the burden of showing that no triable issue remains with respect to its reasons for changing the date. It has not done that. The mere sequence of events in this case is enough to give rise to an inference that IBM wrongfully interfered. Whether plaintiff would ultimately prevail at trial is irrelevant. There is enough evidence before me to conclude that it *might* recover if all inferences are drawn in its favor. Summary judgment is therefore inappropriate.

## CONCLUSION

St. Regis' motion for summary judgment on Counts I and II is allowed. IBM's motion for summary judgment is allowed as to Count III but denied as to Count IV.