COMPUTER SYSTEMS OF AMERICA,
INC., Plaintiff, Appellant,

v.

INTERNATIONAL BUSINESS MA-
CHINES CORP., and St. Regis
Paper Co., Defendants, Appellees.

No. 85–1445.

United States Court of Appeals,
First Circuit.

Argued Oct. 10, 1985.

Decided June 25, 1986.

Henry F. Field with whom Douglas G. Moxham, Friedman & Koven and Hale and Dorr were on brief, for plaintiff, appellant.

Grant S. Lewis with whom Molly S. Boast, LeBoeuf, Lamb, Leiby & MacRae, Paul K. Connolly and John J. Blanchard were on brief, for defendants, appellees.

Before BREYER and TORRUELLA, Circuit Judges, and HILL,* District Judge.

IRVING HILL, Senior District Judge:

In the spring of 1979, Defendant St. Regis Paper Company ("St. Regis") urgently needed an IBM 3033 computer. That model was in great demand and in very short supply. IBM's factory had many backorders and was allocating future production by a lottery which established an estimated delivery date for each order. St. Regis preferred to buy a Model 3033 directly from IBM. It had placed an order, and IBM had assigned an expected delivery date of September, 1979. The September

* Of the Central District of California, sitting by designation.

date was unsatisfactory. St. Regis was just completing a large computer center in Dallas, Texas, and needed the machine earlier. Plaintiff, Computer Systems of America, Inc. ("CSA") is in the business of computer leasing, and CSA had a May allocation from IBM for a 3033 computer. St. Regis was willing and anxious to lease the 3033 from CSA, in lieu of buying one directly from IBM, to obtain the May delivery.

Executives of the two companies met in Dallas to discuss the lease and later, by telephone, agreed on a deal for such a lease. Their agreement included the four-year lease term, the monthly rental payment and the beginning date of the lease term. At CSA's request, St. Regis sent a letter dated April 23, 1979, confirming the agreement. That letter is reproduced in the margin.[1] Counsel for both companies commenced work on a formal, long-form

1. **ST REGIS** PAPER COMPANY   14240 Proton Road, Dallas, TX 75240   214/237-0700

MANAGEMENT INFORMATION SYSTEMS

April 23, 1979

Mr. Benjamin Harrison
Computer Systems of America
141 Milk Street
Boston, Mass   02109
QWIP   #617/482-6162

Dear Mr. Harrison:

Confirming our conversation of Friday, April 20, we propose to lease for a four year term, a 3033-U8 with 12 channels at a monthly rate of $66,805. This lease is dependent upon satisfactory contractual arrangement.

It is anticipated that this computer will be shipped not later than May 18, with a requested two week improvement. We have previously forwarded the necessary cabling order for your consideration.

You advised that IBM would be notified of St. Regis being the ultimate user on Friday, April 20.

Sincerely,

F. S. Wolfe, Manager,
Operations & Information
Systems

aw
cc - Mr. W. C. Allen, St. Regis, New York
     Mr. D. K. Randall, St. Regis, Dallas

lease which both companies intended to sign after the machine was installed. In their oral discussions, the parties had agreed that CSA could claim the Investment Tax Credit—a key subject customarily covered in the long-term lease. Its other provisions were regarded as "boilerplate" and were expected to follow the forms customarily used in the leasing industry.

There is testimony from both sides that clearly shows that as of the date of the April 19 or 20, 1979 telephone conversation, and the April 23, 1979 letter, both parties intended to be contractually bound to the lease deal and considered themselves so bound.

Within about a week after April 23, 1979, IBM told St. Regis that it could deliver a Model 3033 in June rather than September. However, by this time, pursuant to the oral agreement and letter, CSA had already modified its machine to meet St. Regis's particular needs, and had placed it in transit to Dallas. CSA had also taken steps at St. Regis's Dallas computer center to facilitate the installation of the machine there.

At or about the same time that IBM was offering an advanced delivery date if St. Regis would buy the machine from it, a dispute arose between St. Regis and CSA. The dispute involved whether or not, in the oral agreement, St. Regis had agreed to pay "precommencement" rent for the machine from the installation date, May 18, to the commencement date of the lease term, July 15. Both sides agreed that St. Regis could and would be using the machine during that time.

Seizing upon that dispute, St. Regis terminated its dealings with CSA and proceeded to buy the computer from IBM. This action resulted, in which CSA sued both St. Regis and IBM. It sued St. Regis for breach of an express contract and for breach of a contract arising by promissory estoppel. It sued IBM for interference with a contractual relationship and interference with a prospective business relationship.

Both Defendants moved in the trial court for summary judgment, which the court granted as to St. Regis and denied as to IBM. The trial court's opinion is published at 578 F.Supp. 558 (D.Mass.1983). IBM thereafter settled with CSA. CSA appeals to this court from the grant of summary judgment to St. Regis.

St. Regis sought summary judgment below on three alternative grounds. First, St. Regis claimed that there was no contract between the parties which could be enforced because there was no agreement on all essential terms. The trial court rejected that ground, and did not base the summary judgment upon it. Second, St. Regis contended that even if there was an agreement covering all essential terms, the agreement was expressly conditioned upon the execution of a written lease document, and such a document was never executed. It was on this ground, primarily, that the trial court granted summary judgment. Finally, St. Regis argued that any contract which did exist was unenforceable under the statute of frauds. The trial court adopted this contention as a secondary and alternative ground for the summary judgment.

"In determining whether a trial court's grant of a summary judgment motion was appropriate, an appellate court must look at the record in the light which is most favorable to the party opposing the motion. The court also must indulge all inferences favorable to that party." *King v. Williams Industries, Inc.,* 724 F.2d 240, 241 (1st Cir.1984).

A summary judgment is inappropriate where the respondent shows the existence of a bona fide dispute as to a material fact issue so that a jury or judge must "resolve the parties' differing versions of the truth at trial." *Hahn v. Sargent,* 523 F.2d 461, 464 (1st Cir.1975).

The trial court held that Texas law governs this case in all relevant respects. That holding is attacked, in part, by CSA, who contends that Massachusetts, rather than Texas law, should govern the statute of frauds aspect of the case. As will be

seen, we concur with, and adopt, the trial court's conclusion that Texas law governs in all respects. Utilizing Texas law, we have determined that the grant of summary judgment cannot be supported on either of the alternative grounds. We therefore conclude that the judgment should be reversed and the action remanded to the trial court for trial.

## DISCUSSION

### ISSUE I: DID AN ENFORCEABLE CONTRACT EXIST

The trial court decided that as a matter of law no binding obligation, no enforceable contract, existed between the parties. The trial judge rested this critical conclusion solely and entirely upon the second sentence of the April 23, 1979 letter, which reads: "This lease is dependent upon satisfactory contractual arrangements."

The trial judge undertook to construe and interpret that sentence by itself, without reference to its context in the letter and without reference to the testimony of its author and addressee as to what the letter meant. Observing that the sentence in question had a "plain meaning", the trial judge determined that it could have only one possible meaning, i.e., that it was the intention of the parties not to be contractually bound unless and until a written long-form lease was executed. The trial judge apparently held that, as a matter of law, the sentence created a condition precedent. As the trial judge put it, "any agreement was made expressly contingent on a written lease which was never executed."

█ In our view, the trial court's holding in this respect constituted error. We begin by noting that "whether a clause contitutes a condition precedent ... must be determined from the contract as a whole and the surrounding circumstances; conditions are not favored, and a clause will be construed as a covenant only if it is reasonably subject to that interpretation." *Hanson Southwest Corp. v. Dal-Mac Construction Co.*, 554 S.W.2d 712, 720 (Tex.Civ.App. 1977), writ ref'd n.r.e. (citing *Hohenberg*

*Bros. Co. v. George E. Gibbons & Co.*, 537 S.W.2d 1, 3 (Tex.1976)). The sentence, in our view, has neither a plain meaning nor only one possible meaning. It is ambiguous in and of itself, and that ambiguity is enhanced when the sentence is viewed in the context of the entire letter. Under Texas law, an instrument must be viewed in its entirety and "no single portion, sentence, or clause when considered *alone* will control." *Myers v. Gulf Coast Minerals Management Corp.*, 361 S.W.2d 193, 196 (Tex.1962) (emphasis in original); *See also Mayfield v. de Benavides*, 693 S.W.2d 500, 503 (Tex.App. 4 Dist.1985).

The ambiguity is further emphasized and underscored in light of the testimony of the people who negotiated the deal for the parties, including both the author and addressee of the letter. "It is well settled that extrinsic evidence is admissible for the purpose of applying the contract to its subject matter even though the contract is unambiguous." *Texas Utilities Fuel Co. v. First National Bank*, 615 S.W.2d 309, 312 (Tex.Civ.App.1981) (citing *Murphy v. Dilworth*, 137 Tex. 32, 151 S.W.2d 1004, 1005 (1941)). "If the meaning of the language becomes uncertain when applied to the subject matter ... parol evidence may be resorted to in aid of applying the language to the subject matter." *Id.*

If only the bare words of the sentence are examined, a meaning other than the one ascribed to them by the trial judge emerges as a possibility. On its face and by itself, the sentence could be construed to mean that the parties have *now* agreed to all of the essential terms of a lease deal, which is presently binding upon them. But that agreement will be followed by the later execution of a lengthy formal leasing contract which the attorneys will be working on in the meantime and which will contain other terms, many of them "boilerplate", as are customary in the leasing industry. Under this construction, both sides are stating that they intend to be presently bound, and further bind themselves to proceed in good time and good

faith to the execution of the formal detailed lease document.

If the sentence is viewed in the context of the whole letter of which it was a part, the alternative meaning suggested above emerges even more clearly. At a minimum, the entire letter must be examined. "In determining whether a condition precedent exists, the intent of the parties must be ascertained from an examination of the entire instrument." *Kosberg v. Brown*, 601 S.W.2d 414, 416 (Tex.Civ.App.1980). The letter says that the buyer, St. Regis, understands that three days before the date of the letter, (i.e., April 20, 1979), IBM was notified that St. Regis would be the ultimate user of CSA's Model 3033 computer. That language seems to be further confirmation, within the letter itself, of the existence of a binding contract and both parties' intention to be presently bound. St. Regis, the buyer, would have an interest in informing IBM that it was to be the user of CSA's Model 3033, because that would signal to IBM that St. Regis's own order for a Model 3033 and the negotiations as to filling that order were at an end, since St. Regis had decided to acquire the machine elsewhere. CSA, the seller, would have an obvious interest in notifying IBM who the ultimate user would be. Such notification to IBM would be an expected prelude to IBM's receiving instructions for shipping the machine, and for "cabling", special hookup, and other modifications to meet the end user's requirements. In fact, the letter goes on to deal with the latter subjects. It confirms that St. Regis had already "forwarded" the necessary cabling instructions. One could well conclude that an order by the end user to have the machine modified to meet the end user's special requirements would not be given unless and until a binding purchase agreement had been reached.

Thus, in our view, whether the sentence is read in isolation (which we believe is improper), or whether the sentence is read in light of the entire letter, a trier of fact could conclude that a then binding obligation, without any condition precedent, existed. If such is the effect of the sentence alone, or the sentence read in the light of the entire letter, summary judgment is precluded.

Under such circumstances, it was not proper for the trial judge to attribute to the sentence or the letter one possible meaning and preclude a jury from attributing to the language another, at least as plausible, construction.

As Professor Corbin aptly put it:

Words do not have absolute and uniform meanings. The meaning of particular words or groups of words varies with the "... verbal context and surrounding circumstances and purposes in view of the linguistic education and experience of their users and their hearers or readers.... A word has no meaning apart from these factors; much less does it have an objective meaning, one true meaning."

Corbin, *The Interpretation of Words and The Parol Evidence Rule*, 50 Cornell L.Q. 161, 187 (1965).

The trial judge had before her a plethora of evidence in the form of depositions of the executives of both companies who had engaged in the negotiations, including the depositions of both the author and addressee of the April 23, 1979 letter. Had the court utilized that evidence (as the authorities we have cited above indicate she should have), it would have appeared even more clear that a bona fide dispute of material fact exists which precludes granting a summary judgment. The evidence included testimony as follows:

1. Both the author and addressee of the April 23 letter believed that as a result of their negotiations and the letter itself, both sides were already contractually bound.

2. Both sides intended to be presently bound, while recognizing that the full and formal lease agreement would not, as per the custom of the industry, be executed until much later when the machine had been installed and accepted. The practice of signing the detailed lease form much later derives principally from tax considerations. Earlier execution hampers, and pos-

sibly precludes entirely, any claim of the benefits of the Investment Tax Credit, a very valuable benefit under the internal revenue laws. This necessary delay period also gives the lawyers an opportunity to work out all of the manifold terms of the formal lease document at their leisure, while the equipment is being shipped, installed and tested. It is undisputed that the parties agreed in their negotiations that CSA alone would be claiming the Investment Tax Credit.

3. Following the letter, both sides acted as if they were contractually bound. The modification of the machine to meet St. Regis's special needs, the shipment of the machine to Dallas and the notification to IBM that the computer was to be used by St. Regis all corroborate this fact.

4. The attorneys for both sides had negotiated about and had come to substantial, if not total, agreement on the terms of the formal lease document when the dispute about precommencement rent arose. Early on, CSA had provided St. Regis its printed form of the formal lease and no objections had been voiced as to any condition. The usual major problem, i.e., who could claim the Investment Tax Credit, had already been resolved. The CSA printed lease form had, as a result of the lawyers' negotiations, been "redlined" (meaning notation of some minor changes), and it was ready for reproduction in final form and signature at the appropriate time.

5. With respect to the dispute over precommencement rent, there was evidence, and persuasive evidence, that St. Regis had agreed to pay it. St. Regis's chief negotiator had notations to that effect in his own files and CSA's negotiators believed that St. Regis had so agreed. It was CSA's theory that this dispute was deliberately manufactured by St. Regis to provide a colorable pretext for disavowing its lease agreement with CSA, thus freeing St. Regis to deal directly with IBM as it had originally wished to do.

In light of all of the foregoing, CSA, in our view, is entitled to a jury trial to determine whether there was an enforceable contract and, if so, whether St. Regis's refusal to proceed with it was or was not justified.

## ISSUE II: STATUTE OF FRAUDS

### A. *Choice of Law*

The trial court based its grant of summary judgment on the alternative ground that enforcement of the contract between the parties was precluded by the statute of frauds. Thus, our holding that the grant of summary judgment on the first ground constituted error does not, by itself, require a reversal. We must also examine the propriety of the trial court's holding on the alternative ground.

As previously stated, the trial court applied the Texas statute of frauds in reaching that conclusion. The appellant argues that the trial court incorrectly used Texas instead of Massachusetts law to decide the statute of frauds issue. We do not agree with appellant.

The trial judge correctly recognized that in deciding what law to apply to a statute of frauds issue, a federal court sitting in Massachusetts must apply Massachusetts conflict of law rules. Appellant does not quarrel with that. Appellant does say, however, that Massachusetts conflict of law rules require the court to choose and apply Massachusetts law for the decision of the statute of frauds issue. To support that claim, appellant relies principally on a decision of the Massacusetts Supreme Court handed down after the grant of summary judgment in this case, *Bushkin Associates, Inc. v. Raytheon Co.*, 393 Mass. 622, 473 N.E.2d 662 (1985).

In *Bushkin*, the Massachusetts Supreme Court, pursuant to a certification from this court, discussed the Massachusetts conflict of law rules which are to be used in determining what state law should be applied to statute of frauds problems. Declining to prescribe any blanket or universal doctrine to be applied in all cases, the Massachusetts court held in *Bushkin* that the choice of state law in such matters should be governed by the particular facts and cir-

cumstances of each case. The eventual decision of what state law to use should be made after considering the various factors set forth in Sections 6[2] and 188[3] of the Restatement of Conflicts of Law 2d and after considering the interests of the parties and the states involved. *Id.* Applying those principles, the court in *Bushkin* determined to use Massachusetts law as to the statute of frauds issue in that particular case. Among the reasons the Court gave was that Massachusetts law would carry out and validate the transaction which the parties intended, whereas the law of the other state, New York, would defeat it.

We are, of course, required to follow *Bushkin.* But we conclude that *Bushkin* does not require the use of Massachusetts law in this case, and the trial court's decision to use Texas law was correct.

Neither party has carefully abstracted the statute of frauds law of Massachusetts and compared it to the equivalent law of Texas. Appellants argue that Massachusetts law is more liberal to the party seeking enforcement of a contract, and the trial judge apparently agreed with that general proposition. *See* 578 F.Supp. at 561 n. 1. In *Bushkin,* the Massachusetts Supreme Court decided that when the contacts with the two states in question are quite equal, and where the statute of frauds of one of the two states is more liberal in recognizing and enforcing the existence of a contract which the parties intended, the more liberal rule should be preferred.

■ However, the predicate of *Bushkin,* equality of contacts, does not exist in this case, and thus *Bushkin's* choice of the more liberal law is not required here. In our case, if one looks at the contacts as between Massachusetts and Texas, the Texas contacts clearly predominate, as the trial court found. In our case, the computer was to be installed in Texas, it was already shipped to Texas for installation, the only face-to-face contract negotiation occurred in Texas, and in the long form of lease which had been, for all practical purposes, agreed upon, there was a provision applying Texas law to all aspects of the transaction. Moreover, the critical letter of April 23, 1979, was written in Texas and sent from that state.

Thus, we reject the claim that Massachusetts law should be applied to the statute of frauds problem, despite the possibility that it is more liberal than Texas law in enforcing an agreement of the type we are considering here. Having said that, we hasten to add that we are convinced that even under Texas law, the trial court erroneously granted a summary judgment for St. Regis based on the statute of frauds.

---

**2.** "(2) When there is no [statutory] directive, the factors relevant to the choice of the applicable rule of law include
    (a) the needs of the interstate and international systems,
    (b) the relevant policies of the forum,
    (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,
    (d) the protection of justified expectations,
    (e) the basic policies underlying the particular field of law,
    (f) certainty, predictability and uniformity of result, and,
    (g) ease in the determination and application of the law to be applied."

**3.** "(1) The rights and duties of the parties with respect to an issue in contract are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the transaction and the parties under the principles stated in § 6.

(2) In the absence of an effective choice of law by the parties, the contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:
    (a) the place of contracting,
    (b) the place of negotiation of the contract,
    (c) the place of performance,
    (d) the location of the subject matter of the contract, and,
    (e) the domicil, residence, nationality, place of incorporation and place of business of the parties.
These contacts are to be evaluated according to the relative importance with respect to the particular issue.
(3) If the place of negotiating the contract and the place of performance are in the same state, the local law of this state will usually be applied . . ."

## B. *Texas Statute of Frauds*

With respect to the statute of frauds, CSA made two separate arguments to the trial court. It argued first that the April 23, 1979 letter, when supplemented by the unsigned CSA detailed lease form which St. Regis had in its possession and the notes that St. Regis's vice president had made on that form, met the requisites of a writing needed to satisfy the statute of frauds. As a backup position, CSA argued that even if there were no sufficient writing to escape the statute of frauds, St. Regis was estopped from asserting the statute as a defense. The trial judge rejected both claims.

With respect to the sufficiency of the writing, the trial judge held that the lease form could not be considered by the court as a part of the writing, because, under Texas law, an unsigned document may only be used where the signed document makes some reference to it, and the court found that the letter made no reference to the unsigned lease form. Without use of the lease form as a supplement, the trial judge held that the agreement of the parties was unenforceable under the statute of frauds because the letter lacked two essential terms, namely, the lease commencement date and a provision as to precommencement rental.

■ We believe that the trial court misapplied Texas law in holding that the lease form could not be considered along with the letter to supply missing terms. As we have already indicated in our earlier discussion of the existence of a contract, there was testimony that the agreement of the parties consisted of both the letter and the lease form, and that the letter, when interpreted as CSA's witnesses interpreted it, did contain a reference to the lease form. CSA presented sufficient evidence for a jury to determine whether those alleged facts were true.

It goes without saying that if the letter and the lease form are both considered by the trier as part of the writing, the two documents together could be found to supply all necessary terms. Again, there was a right to have a jury so determine. This is especially true in light of the undisputed fact that St. Regis's vice president wrote on his copy of the lease form both the commencement date of the lease and figures that could have had no reference except to the subject of precommencement rental.

The trial court also found that, regardless of whether the lease form could supplement the letter, the Texas statute of frauds requires the writing relied on to contain some acknowledgement that a contract exists. Based upon her earlier construction of the letter as stating a condition precedent, she read the letter as containing no acknowledgement that a contract existed.

As we have previously stated, CSA was entitled to a jury trial on the question of whether the contract contained a condition precedent, and summary judgment based on a holding by the court that a condition precedent existed was improper.

## ISSUE III: ESTOPPEL

■ Our holding immediately above mandates reversal on the statute of frauds issue, and consideration of CSA's estoppel claim could be viewed as unnecessary. However, since we remand the case for trial, and since the estoppel issue may, depending on the jury's findings, become important at the trial, we proceed to discuss that issue as well.

Under Texas law, a party can be estopped to assert a statute of frauds defense. In *"Moore" Burger, Inc. v. Phillips Petroleum Co.*, 492 S.W.2d 934 (Tex. 1972), the Texas Supreme Court held that where one's oral promise contains a promise that he will sign a writing which itself will satisfy the statute of frauds, and where the oral promise induces a change of position to the detriment of the promisee, an estoppel exists. In rejecting CSA's claim that St. Regis was estopped, the trial judge held that there was no evidence of a promise by St. Regis to sign a writing which would satisfy the statute of frauds.

**1094**

Our discussion under Section I above demonstrates that a jury could find that St. Regis made such a promise in this case. As we have demonstrated, a jury could find that the April 23 letter contained a promise by St. Regis to execute, at an appropriate later time, a comprehensive and formal lease form bearing such terms as were customary in the industry. We also believe that a jury could find that St. Regis induced CSA to change its position to its detriment. Thus, under *"Moore" Burger*, summary judgment as to estoppel is precluded.[4] *See Cobb v. West Texas Microwave Co.*, 700 S.W.2d 615 (Tex.App. 3 Dist. 1985).

One last word is appropriate on the entire matter of the statute of frauds. High ranking officials of both corporations agree that when their oral negotiations were over and the April 23 letter was sent, both sides considered themselves bound to each other contractually and intended to be so bound. Each side thereafter acted as if it were so bound. To allow St. Regis to employ the statute of frauds as a defense would, under such facts, be particularly ironic. The statute of frauds is intended as a protection against false and fraudulent claims that a contract exists. As the Texas court said in *Toland v. Azton*, 553 S.W.2d 433 (Tex.Civ. App.1977), "If appellant's evidence be accepted as true, enforcement of the statute of frauds should itself amount to a fraud on appellant's rights." 553 S.W.2d at 435. As in *Toland*, if the instant summary judgment is allowed to stand based on the statute of frauds, without a jury being allowed to judge the evidence we have set forth in this opinion, the statute of frauds would be used not to prevent fraud, but to perpetrate it.

The judgment is reversed and the case is remanded for further proceedings consistent with this opinion.

4. In Footnote 3 of the opinion below (578 F.Supp. at 562), the trial judge observed that some Texas cases "indicate" the existence of an even broader estoppel doctrine. Those cases, the trial judge observed, might be read to create an estoppel to assert the statute of frauds without a promise to sign a writing sufficient to meet the statute if the defendant had been unjustly enriched. The trial judge declined to give CSA the benefit of this doctrine because she found it "difficult to see" any unjust enrichment of St. Regis.

It is not clear to us that Texas law contains this broader estoppel doctrine. The doctrine is not clearly stated in any Texas case. If the doctrine exists, it seems to us that it would eviscerate the statute of frauds and defeat its basic purpose. If it becomes necessary on remand, the trial court will be required to divine Texas law on this subject and formulate it in jury instructions. However, if the doctrine does exist we think a jury could find from the evidence the existence of an unjust enrichment to St. Regis. St. Regis, by its conduct, secured from CSA what was in effect an option to buy this valuable machine, and induced CSA to keep it off the market when the machine was in great demand. That option would seem enough, without more, to support a finding of unjust enrichment.