**TORCO OIL COMPANY, Plaintiff,**

v.

**LTV STEEL COMPANY, Defendant.**

No. 88 C 8367.

United States District Court,
N.D. Illinois, E.D.

March 14, 1989.

Francis X. Grossi, Jr., Karyn G. Gershon, Katten Muchin & Zavis, Chicago, Ill., for plaintiff.

Stephen E. Sward, Terrence M. Burns, Jay A. Lipe, Rooks Pitts & Poust, Chicago, Ill., for defendant.

## MEMORANDUM AND ORDER

MORAN, District Judge.

Plaintiff moves, pursuant to Rule 56 of the Federal Rules of Civil Procedure, for summary judgment, alleging it is owed over $800,000 for gas both sides admit was delivered to defendant. Because we hold there are genuine issues as to material facts which might enable defendant to demonstrate it is within its legal rights to refuse payment, we deny plaintiff's motion.

Plaintiff Torco Oil Company ("Torco") and defendant LTV Steel Company, Inc. ("LTV") entered into negotiations in either May or June 1988 (the exact date is a matter of dispute between the parties) for the former to supply natural gas to the latter. These negotiations continued from that disputed time until August 1988.

LTV alleges that a revised contract dated June 22, 1988 resulted from the Torco/LTV discussions which began in May 1988. This June 22, 1988 contract purportedly contemplated a starting date of July 1, 1988, but performance at that time was apparently impossible due to pipeline problems. The parties instead agreed the flow of gas would commence August 1, 1988, if the pipeline difficulties could be resolved.

That agreement was reduced to a writing dated June 24, 1988 and sent to Torco by LTV.

As early as the second week of July 1988 it appeared the parties were about to close the deal. At Torco's request LTV sent Torco a letter dated July 11, 1988, which represented that LTV had nominated 25,000 MMBtu/day for August 1988. Torco needed this confirmation in order to procure a letter of credit from Bank of America—a prerequisite to Torco's own purchase of the gas which would be resold to LTV. The treasurer of Torco, a Mr. Crow, acknowledged this arrangement in a July 14, 1988 letter and strongly insinuated a meeting of the minds had been reached for the entire year:

> This is to notify you that proceeds due from you under our contract to supply you with approximately 25,000 MMBtu of natural gas per day at $1.50 per MMBtu during the period of August 1, 1988 through July 31, 1989 have been assigned to Bank of America for the account of Torco Oil Company.

The Bank of America confirmed to LTV by telex on July 15:

> Bank of America NT and SA hereby notifies you that Torco Oil Company has granted to the bank an assignment and security interest in the payment due from you to them with respect to your purchase of approximately 25,000 MMBtu of natural gas per day at USD 1.5 per MMBtu during the period of August 1, 1988 through July 31, 1989.

On July 18, 1988, a Mr. Sanders of LTV proposed additions and corrections to the agreement dated June 24, 1988. An agreement which reflected these changes was sent by Gregory Wilkins, the executive vice-president of Torco, to LTV. This document, entitled "Firm Gas Sales Agreement" ("Sales Agreement"), was dated July 31, 1988 and signed by Mr. Wilkins. On August 2, 1988, Mr. Wilkins forwarded a letter to LTV and enclosed a second original of what he referred to as "our gas supply contract"—the July 31, 1988 Sales Agreement.

Gas did not begin to flow until August 6, 1988, when Torco delivered 25,000 MMBtu to LTV. Torco subsequently delivered 15,000 MMBtu on August 7, 1988, 25,000 MMBtu daily between August 8 and August 25, 1988, and 10,000 MMBtu per day from August 25 to August 31, 1988.

During this period, on August 11, 1988, Torco sent LTV a letter revoking the Sales Agreement and characterizing it as merely an "offer." This resulted in an August 18, 1988 meeting where Torco demanded a higher price in consideration for an option permitting LTV to extend the agreement. On that same day, a Mr. Windahl, LTV's vice-president for purchasing, signed the Sales Agreement of July 31, 1988, and sent it to Torco. LTV also served written notice of its objections to Torco's attempted revocation. Torco ceased gas deliveries as of September 1, 1988 and has not resumed them.

The Sales Agreement provides for payment of the August 1988 gas on September 27, 1988. On that date, LTV notified Torco that, instead of mailing payment, it would offset the amount due for the August 1988 gas against the damages purportedly suffered by Torco's breach of the year-long contract.

Torco claims the August 1988 gas was supplied pursuant to an interim agreement separate and distinct from the long-term "offer" represented by the Sales Agreement and presumably contained in the July 11, 1988 nomination letter. LTV instead contends the August, 1988 gas was the first month's installment pursuant to the "contract" represented by the Sales Agreement.

### DISCUSSION

I. *The Factor Which Determines the Propriety of Setoffs*

As a legal matter, the motion is quite simple: is plaintiff's claim merely part and parcel of the disputed legal sufficiency of the Sales Agreement, or is it brought pursuant to a separate agreement?

The controlling law stems from *Schieffelin & Co. v. Valley Liquors, Inc.*, 823 F.2d

1064 (7th Cir.1987). In affirming Judge Norgle's opinion, the court favorably quoted his description of the crux of the dispute:

> The issues involved in the counterclaim are not so closely related to the plaintiff's claim that summary judgment on the complaint should be delayed until the counterclaim is resolved.

*Id.* at 1065. *Schieffelin* held the defendant liquor and wine distributor could not refuse payment for goods it admittedly purchased because the plaintiff importer had purportedly breached the best-efforts clause of the parties' distributorship agreement. The court invoked section 2–717 of the Uniform Commercial Code ("UCC"), Ill.Rev.Stat. 1983, ch. 26 ¶ 2–717, to recognize that the law permits setoffs where the alleged breach and payment due relate to the same contract. But since the best-efforts clause was part of the distributorship agreement and therefore irrelevant to the various individual contracts for purchase, the distributor's setoff was held to be improper. "As to any sale, however, the price, type, and quantity of goods sold resulted from accepted purchase orders and not from the distributorship agreement." *Schieffelin,* 823 F.2d at 1067.

The issue here, therefore, centers on whether the August gas was delivered pursuant to the Sales Agreement. If so, then LTV was within its legal rights in discharging its obligation, pending the resolution of the breach dispute, to pay Torco.

## II. *One Contract*

### A. *The Legal Standard*

Illinois law determines which facts are material to deciding whether the Sales Agreement was a contract. We have visited this aspect of Illinois law before, *see, e.g., A/S Apothekernes Laboratorium v. I.M.C. Chemical,* 678 F.Supp. 193 (N.D.Ill. 1988), *appeal dismissed,* 725 F.2d 1140 (7th Cir.1984), and continue to view the relevant legal considerations as uncontroversial.

> Under Illinois law the question of whether a binding contract exists is determined by the intent of the parties.... In measuring intent, all relevant circumstances surrounding negotiations and execution of agreement should be considered.... Moreover, the contemplation of the execution of a formal agreement in the future does not render prior agreements mere negotiations where the parties intend that the formal agreement will be substantially based upon the earlier agreement.

*Evans, Inc. v. Tiffany & Co.,* 416 F.Supp. 224, 238 (N.D.Ill.1976). A determination of the "intent of the parties" depends not upon their subjective beliefs but upon the objective manifestations of their intention *See Skycom Corp. v. Telstar Corp.,* 813 F.2d 810, 814–815 (7th Cir.1987) (applying Wisconsin law); *see also A/S Apothekernes Laboratorium,* 678 F.Supp. at 195. " 'Intent' is a conclusion flowing from a complex of facts and legal precedent." *Id.* (citation omitted).

The determination of whether negotiations have moved past the point at which the law recognizes the then existing results as a "contract" presents particular difficulties. *Compare Computer Systems of America, Inc. v. International Business Machines Corp.,* 795 F.2d 1086 (1st Cir. 1986) *with Reprosystem, B.V. v. SCM Corporation,* 727 F.2d 257 (2d Cir.1984), *cert. denied,* 469 U.S. 828, 105 S.Ct. 110, 83 L.Ed.2d 54 (1984). "It is an odd form of factual determination—in a mix of circumstances have the parties proceeded so far down the road that one of the parties cannot unilaterally decide to end the journey." *A/S Apothekernes Laboratorium,* 678 F.Supp. at 195.

### B. *Factual Application*

Defendant's evidence that the August 1988 gas was delivered pursuant to the Sales Agreement sufficiently disputes the existence of a separate interim agreement for the month of August. Put another way, because plaintiff has failed to prove without question that the Sales Agreement was merely an offer, the August gas was not indisputably delivered pursuant to an interim agreement and summary judgment for the monies purportedly due thereunder is inappropriate.

Torco's case centers on its claim that the Sales Agreement was merely an offer it

revoked prior to LTV's acceptance. It emphasizes the absence of an LTV official's signature until August 18, 1988, a week after the August 11 revocation. LTV contends the signature was executed only to be consistent with "good corporate form," that the Sales Agreement was already binding.

The lack of an offeree's signature is not an essential prerequisite for acceptance. After having received the Sales Agreement signed by Torco, LTV received considerable amounts of natural gas. In such circumstances, LTV's acceptance can be inferred. "An offeree may also be regarded as having accepted a tendered contract by accepting the benefits of the contract." *Arco Petroleum Products Co. v. R & D Automotive, Inc.*, 118 Ill.App.3d 634, 638–39, 455 N.E.2d 227, 230–31, 74 Ill.Dec. 197, 200–01 (1st Dist.1983). Writings unilaterally signed are also often consistent with the Statute of Frauds. "It is no defense, insofar as compliance with the Statute of Frauds is concerned, that such a contract [signed by the party to be charged] lacks mutuality of obligation in that it is not enforceable against the other, nonsigning party. Rather, by bringing suit on the contract to enforce it, the nonsigning party has bound himself and thereby rendered the contract mutual." *Cottom v. Kennedy*, 140 Ill.App.3d 290, 293, 488 N.E.2d 682, 685, 94 Ill.Dec. 683, 686 (5th Dist.1986). And while Torco claims compliance with the Statute of Frauds isn't legally sufficient, it concedes such a writing is *evidence* of a valid contract. That is, of course, enough to render summary judgment inappropriate.

Torco also claims the Sales Agreement couldn't have been binding because it differed only slightly from the June 22, 1988 document which both sides concede was not a legally enforceable contract. LTV disputes the underlying assumption and contends there were material omissions in the June 22 document which were addressed in the July 31, 1988 Sales Agreement.

We agree. As Mr. Sanders describes, "the appendix was going—the problem here was it [the form document] was Mobil's contract and the appendix A didn't really make sense in this agreement" (Sanders dep. at 39–40). Sanders also testified that the "points of delivery were not agreed upon at that time." *Id.* at 40. Furthermore, we do not put much faith in LTV's admission that the June 22, 1988 document was not legally enforceable. As explained *infra*, we look to the parties' characterization of the negotiations, *e.g.*, reference to a particular document as a contract or draft, as merely evidence of intent. Because we will not be bound by lay characterizations of legal determinations, it is entirely possible legal obligations were created on June 22 but subsequently extinguished—first by the June 24 document and then by the July 31 Sales Agreement. In sum, ample disputes exist here, too, so as to render summary judgment inappropriate.

Plaintiff is also far from demonstrating the nomination letter of July 11, 1988 constituted a separate agreement for the month of August. That letter merely began the flow of gas. Why a one-month period was chosen is disputed: Torco claims it represents the duration of the interim agreement, while LTV claims month-to-month assurances help to reduce bank charges.[1]

We are also unable at this time to evaluate the import of the parties' own various characterizations. For example, Torco claims Mr. Suhoza admits the copy of the Sales Agreement he sent to Mr. Windahl was labeled "draft." In another context, however, Torco is much less willing to defer to lay opinions:

---

**1.** LTV also claims the rationale for the July 11 letter—confirmation in order to procure a letter of credit from Bank of America—demonstrates that a contract had effectively been negotiated because "only the proceeds of a contract for the sale of gas could be financed" (LTV's response at 7). That's quite an oversimplification and one that's perhaps incorrect. The July 11 letter demonstrates Torco had a contract for the delivery of gas to LTV; it does not clarify the *term* of that arrangement. Notwithstanding the references to a one-year contract in subsequent correspondence between the bank and LTV, the July 11 letter might be interpreted to suggest merely an agreement for August. As textually described, a dispute exists as to exactly why a one-month term was chosen.

LTV attempts to make much of the fact that both Torco's financial officer and Wilkins referred to the various writings as a "contract." The fact that a layman refers to an offer or a proposed arrangement as a "contract" has no more probative value than other common references to documents, signed or unsigned, such as "will." (Torc's reply brief at 5 n. 2.) As mentioned above, lay characterizations are relevant to the extent they represent evidence of intent, exactly the type of evidence to which we look to determine whether a contract exists. Individual circumstances, however, often influence how the trier of fact can view particular lay expressions. For example, Mr. Suhoza contends the word "draft" means merely that some "technical changes" to the attachment were needed (Suhoza dep. at 136–37). In sum, therefore, it is impossible for either parties' characterizations to render the issue of contractual obligation beyond dispute.

In any event, the nomination letter lacked such crucial elements as price and place of delivery. The Sales Agreement, however, explicitly provided those terms. So to the extent any obligations at all were created by the July 11 letter, we consider them to have been extinguished and created anew by the Sales Agreement of July 31, 1988. "Merger occurs when a contract supersedes and incorporates all or part of an earlier agreement. When a subsequent contract relates to the same subject matter and has the same terms as a previous contract, the actions of the parties are based on the provisions of the later executed document." *American National Bank & Trust Co. of Chicago v. Bentley*, 159 Ill. App.3d 27, 29, 512 N.E.2d 12, 13, 111 Ill. Dec. 108, 109 (1st Dist.1987) (citation omitted).

## CONCLUSION

For the foregoing reasons, plaintiff's motion for summary judgment is denied.

