SKYCOM CORPORATION and Gerald M. Walters, Plaintiffs-Appellants,

v.

TELSTAR CORPORATION, Defendant-Appellee.

No. 86–1206.

United States Court of Appeals, Seventh Circuit.

Argued Oct. 28, 1986.

Decided March 3, 1987.

As Amended March 17, 1987.

Michael S. Heffernan, Walter & Halling, S.C., Milwaukee, Wis., for plaintiffs-appellants.

Ralph V. Topinka, Quarles & Brady, Madison, Wis., for defendant-appellee.

Before FLAUM and EASTERBROOK, Circuit Judges, and WILL, Senior District Judge.[*]

EASTERBROOK, Circuit Judge.

Skycom Corp. and Telstar Corp. provide pay-TV services such as Home Box Office to customers by microwave transmissions, bypassing the cables often used to convey the signals. The assets of their line of business include the radio dishes needed to receive signals from satellites or local microwave repeaters, licenses from the FCC and local governments to set up transmission and reception equipment, and contracts with customers. Skycom operated principally in and near Milwaukee but was trying to enter the Chicago market; Telstar operates nationwide. In 1982 Skycom and its president (and sole stockholder) Gerald Walters opened negotiations with Telstar to sell Skycom's assets to Telstar.

## I

Telstar, like Skycom, was interested in the Chicago market. Satellite Television, Inc. (Sat-Tel), a third firm, had a license to transmit pay-TV signals within Chicago. Walters tried to acquire Sat-Tel and its license. WGGO, Inc., a shell corporation formed by attorney Stephen Schlegel at Walters's request, acquired on July 29, 1982, the right to negotiate further concerning Sat-Tel's stock. Schlegel nominally owned all of the stock of WGGO, but Walters was entitled to buy the stock from Schlegel. The contract between Sat-Tel and WGGO called for WGGO to put up $10,000 in earnest money, which would give WGGO negotiating rights through August 31, 1982. Shortly after signing the July 29 contract on behalf of WGGO, Walters called the president of Telstar to offer Skycom's assets.

The negotiations between Skycom and Telstar progressed quickly. On August 21 Telstar sent Walters a letter outlining the details of an acquisition. Walters proposed amendments in a letter dated August 25. Telstar replied with a letter dated September 1, accepting most of Walters's proposals. This letter sets out "the terms and conditions of our [Telstar's] agreement in principle to acquire the assets of Skycom.... Your [Walters's] signature on this letter will indicate your and Skycom's acquiescence and agreement to the terms and conditions outlined herein." The letter enumerates both terms (such as a promise to give Walters 200,000 shares of Telstar stock and employ him for three years) and conditions (such as limitations on the liabilities of Skycom that may exist at the time of the acquisition). Paragraph 5 of the letter states:

> You are warranting that you hold the sole ownership of WGGO, Inc., an Illinois corporation, which is in the final stages of a negotiation to purchase shares of stock in Satellite Television, Inc. from Lawrence A. Myers and Earl J. Niemoth (the "SAT–TEL Agreement"). Telstar shall have the right to continue the negotiations on the SAT–TEL Agreement in place of WGGO, Inc. The negotiations shall continue on the basis of the draft agreement attached hereto and Telstar shall also meet the requirement of the earnest money deposit of $10,000 while further negotiations continue.

The penultimate paragraph of the letter contains a promise by Walters not to disclose the terms, conditions, or "even the existence of these negotiations" and a pledge by Walters that "there will be no other negotiations by you with any other entity concerning these business transactions during the course of these negotiations with Telstar." Several paragraphs of the letter refer to a "formal agreement" to be signed later, and in the final paragraph Telstar promises to "work diligently to con-

[*] Hon. Hubert L. Will, of the Northern District of Illinois, is sitting by designation.

clude this transaction expeditiously." One "contingent condition" contained in the letter states: "[t]he purchase of the [Skycom] assets envisioned hereunder shall be completed on or before September 15, 1982."

Walters signed this letter on September 5, 1982, under the word "Accepted" that Telstar had typed at the close. He returned it to Telstar. He also put Telstar in touch with the shareholders of Sat-Tel, ceased negotiating with Sat-Tel himself, and advised Telstar how it might deal with a rival bidder for Sat-Tel. Walters told Schlegel to continue the negotiations on Telstar's behalf and bill Telstar for all work after August 24; Schlegel did so, and Telstar agreed to pay the bills. Telstar remitted $10,000 to Schlegel to hold as earnest money. Telstar acquired Sat-Tel on November 15.

But all had not gone well. WGGO's option had expired on August 31, 1982, five days before Walters signed the letter; WGGO never did put up the $10,000. Walters's "warranty" in paragraph 5 that he was the only owner of WGGO was false, although perhaps harmlessly so. Some other points covered in the letter proved troublesome. Walters was unable to reduce Skycom's debt to the level specified. The deal did not close on September 15. Walters was unable to reduce the debt even by November 15, an extended date the parties began using. In a letter dated November 10, 1982, Walters's lawyer informed Telstar that the liabilities remained outstanding and also declined to complete the deal on the ground that the 200,000 shares of stock would not be liquid. The September 1 letter referred to the securities as "200,000 shares of Telstar investment stock, appropriately legended pursuant to SEC regulations."[1] Walters chafed at the restrictions on reselling this stock and suggested substituting either registered stock or $70,000 in cash. Telstar did not accept either alternative.

The deal came apart. Telstar asserted that Skycom was not sufficiently profitable. ("Contingent condition" 5 in the September 1 letter is that "[t]he intended business operations are deemed practicable by Telstar.") Telstar walked away with the Sat-Tel license (obtained directly from Sat-Tel); Walters was left with Skycom. Walters believes that the negotiations were a ruse to acquire the Sat-Tel license and that Telstar never intended to close. Telstar replies that it wanted to complete the transaction but could not because Skycom carried excess liabilities and Walters balked at the terms contained in the letter. Telstar also asserts that the warranty in paragraph 5 was false—both because Walters did not own WGGO and because by September 1 WGGO had no ongoing negotiations with Sat-Tel that it could transfer to Telstar.

In April 1983 Skycom and Walters filed suit in a Wisconsin court. The complaint alleged that the letter of September 1 is a contract and demanded specific performance: 200,000 shares of Telstar stock; $146,000 for lost salary and bonus; 20% of Telstar's profits from its Chicago and Milwaukee operations; and the assumption of Skycom's debts. Telstar removed this suit to federal court on the basis of diversity of citizenship, see 28 U.S.C. §§ 1332(a)(1) and (c), 1441(a). Skycom and Walters amended their complaint in February 1984 to add damages claims sounding in breach of contract, fraud, misrepresentation, and racketeering under civil RICO, 18 U.S.C. §§ 1962(b), 1964. The district court granted Telstar's motion for summary judgment, holding that the text of the September 1 letter reveals that the parties contemplated a subsequent definitive agreement. As a result, the judge concluded, the September 1 letter is not a contract. The judge did not discuss the claims sounding in fraud or RICO. The parties agree on the facts,

---

1. In other words, the stock would be unregistered, issued under the § 4(2) private placement exemption from registration, see 15 U.S.C. § 77d(2), or the Regulation D exemption, see 17 C.F.R. § 230.501–06. The reference to a legend suggests that the transfer would be under Regulation D. See 17 C.F.R. § 230.502(d)(3). In either case Walters would be unable to resell the stock for two or three years, and even then Walters probably would need to satisfy the requirements of Rule 144. See 17 C.F.R. § 230.144.

although they vigorously dispute the inferences that may be drawn.

## II

The letter of September 1 describes itself as an "agreement in principle", the sort of depiction that regularly is taken as an expression of a desire not to be bound. E. Allan Farnsworth, *Contracts* 117 n. 3 (1982) (collecting cases). The letter speaks of a "formal agreement" that is to be signed by September 15. The letter contains representations that must be checked and undertakings to be completed, such as Skycom's promise to reduce its debt to a specified level. On top of that, the letter contains two clauses that give Telstar a right to back out. Paragraph 2 states that the deal will proceed only if the lenders on the two notes Telstar agrees to purchase "will agree to refinance the notes on terms acceptable to Telstar." "Contingent condition" 5 is that "[t]he intended business operations are deemed practicable by Telstar." A natural reading of this document is that the parties have agreed on some terms (such as the number of shares of stock Walters will receive) but left open others (such as the rate of interest Telstar will pay on the debts it assumes) and have recognized the need to tie down these open terms before closing the deal.

■ The letter could be treated as an "agreement to agree" on the open terms. There may be a commitment to close the deal, although perhaps with an adjustment of the price if Skycom cannot reduce its debt or the operations are not "practicable" with a given rate of interest. As an "agreement to agree", however, it is not enforceable. The parties agree that this case is governed by the law of Wisconsin. Under Wisconsin law, agreements to agree do not create binding obligations. See *Witt v. Realist, Inc.*, 18 Wis.2d 282, 298, 118 N.W.2d 85, 93–94 (1962); *Dunlop v. Laitsch*, 16 Wis.2d 36, 113 N.W.2d 551 (1962).

A different approach, which the plaintiffs press, is that the September 1 letter is definitive but contains a few unimportant gaps. The problem with this position is the repeated references to a later "formal agreement" and the listing of six "contingent conditions" that determine whether the formal agreement comes into being. Skycom never satisfied the condition dealing with its debt, Walters and his attorney tried to renegotiate the deal, and Telstar stood on another condition (No. 5) that appears to give it a right of veto. The district court treated the reference to the contemplated "formal agreement" as sufficient to establish that the letter is not a contract.

■ In Wisconsin the binding quality of a writing depends on the intent of the parties. *Garrick Theater Co. v. Gimbel Bros., Inc.*, 158 Wis. 649, 656, 149 N.W. 385, 388 (1914); *Milwaukee Medical College v. Marquette University*, 208 Wis. 168, 170–71, 242 N.W. 494, 496 (1932); *Peninsular Carpets, Inc. v. Bradley Homes, Inc.*, 58 Wis.2d 405, 415–16, 206 N.W.2d 408, 413 (1973). We have applied Wisconsin law in this way many times. *Lambert Corp. v. Evans*, 575 F.2d 132, 135 (7th Cir.1978); *Gruen Industries, Inc. v. Biller*, 608 F.2d 274, 280 (7th Cir.1979); *Ginsu Products, Inc. v. Dart Industries, Inc.*, 786 F.2d 260 (7th Cir.1986). The parties are masters of their affairs. They may elect not to be bound by writings, however formal; they also may elect to be bound by writings that call for subsequent memorials. The reference to "intent" appears to preclude summary judgment, because Walters stoutly maintains that he subjectively intended to be bound and he wants to invite a jury to infer the same about Telstar. Disputable inferences of this sort, if material, are for the jury (or the judge in a bench trial).

Yet "intent" does not invite a tour through Walters's cranium, with Walters as the guide. Like most other states, Wisconsin takes an objective view of "intent." "The intent of the parties [to be bound] must necessarily be derived from a consideration of their words, written and oral, and their actions." *Household Utilities, Inc. v. Andrews Co.*, 71 Wis.2d 17, 28–29, 236 N.W.2d 663, 669 (1976). See also Farnsworth at 113–16. Secret hopes and wishes count for nothing. The status of a

document as a contract depends on what the parties express to each other and to the world, not on what they keep to themselves. It is therefore unimportant whether Walters expected this letter to be the definitive agreement; the binding force of the document depends on public or shared expressions. These often will be undisputed, making summary judgment appropriate. E.g., *Gruen Industries* (affirming a grant of summary judgment holding that a document is not a contract because the parties did not intend to be bound); *R.G. Group, Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 77 (2d Cir.1984) (same). Material disputes may remain even under an objective approach to intent, see *Western Industries, Inc. v. Newcor Canada Ltd.*, 739 F.2d 1198, 1205 (7th Cir.1984), but the recitation that "intent matters" does not on its own call for a trial.

The objective approach is an essential ingredient to allowing the parties jointly to control the effect of their document. If unilateral or secret intents could bind, parties would become wary, and the written word would lose some of its power. The ability to fix the consequences with certainty is especially important in commercial transactions that are planned with care in advance. A merger or the acquisition of assets will create many potential difficulties, and the parties should be able to choose with precision the point at which they can no longer back out. This transaction, for example, presented questions about the size and interest rate of Skycom's debt, the assignability of Skycom's contracts with customers, and the status of the negotiations with Sat-Tel, all of which would have been important to the desirability of a transaction or the price to be paid. On September 1 some of these questions remained unresolved. A rule of law that could bind the parties to a deal in the midst of resolving these uncertainties—perhaps worst of all, inject the random element of a jury's determination about subjective intent—would make transactions riskier. Some beneficial transactions would be forgone. Others would become more cumbersome, as the parties refused to commit intermediate steps to paper or inserted elaborate disclaimers. The commercial practice of describing intermediate steps as "agreements in principle" or "letters of intent"—and distinguishing these from binding "formal agreements"—makes complex transactions easier to plan and ultimately works to the advantage of all concerned.

As a rule, "agreements in principle" that refer to subsequent "formal agreements" are not binding. Even Professor Corbin, one of the great exponents of the subjective approach to intent, took this view.

> One of the most common illustrations of preliminary negotiation that is totally inoperative is one where the parties consider the details of a proposed agreement, perhaps settling them one by one, with the understanding during this process that the agreement is to be embodied in a formal written document and that neither party is to be bound until he executes this document.

1 Arthur Linton Corbin, *Contracts* § 30 at 97 (1963). Perhaps the best modern example of this principle is *Reprosystem, B.V. v. SCM Corp.*, 727 F.2d 257 (2d Cir.), *cert. denied*, 469 U.S. 828, 105 S.Ct. 110, 83 L.Ed.2d 54 (1984). Reprosystem and SCM negotiated for months about the sale of SCM's foreign subsidiaries to Reprosystem. They hammered out the details of an agreement with great care. They produced a document designated an "agreement in principle". The "agreement in principle" was definitive, containing all of the terms. The parties shook hands and exchanged congratulations. SCM then issued a press release announcing the "agreement in principle". 727 F.2d at 259–60. SCM later reviewed the operations of the subsidiaries, concluded that they were more profitable than it had thought at the time of the negotiations, and refused to sign the formal agreement. After a full trial the district court concluded that the parties subjectively intended to be bound by the agreement in principle. The Second Circuit reversed, holding that as a matter of law a negotiation looking toward a definitive contract leaves the parties unbound until the closing. *Id.* at 261–63. The parties negoti-

ated toward a formal contract and did not reach it; that the contract fell through only because one party got cold feet or wanted to renegotiate was unimportant, because that is simply the definition of not (yet) being bound. Insistence on a complete deal, the court pointed out, reflects the "practical business need to record all the parties' commitments in definitive documents." *Id.* at 262–63. *Reprosystem* was decided under New York law. Wisconsin law, which does not enforce "agreements to agree", must come out the same way.

The other pole is represented by *Computer Systems of America, Inc. v. IBM Corp.*, 795 F.2d 1086 (1st Cir.1986) (Texas law). One firm agreed to lease a computer to another. A letter agreement established the rental, duration, and details of delivery but stated that the arrangement was "dependent upon satisfactory contractual arrangement." *Id.* at 1087. Both sides conceded that they intended to be bound forthwith and that the "contractual agreement" referred to was to be a record of an agreement already made. The only contentious point had been the allocation of tax credits, on which the parties had agreed by the time they signed the letter. The computer was delivered and worked as promised. The First Circuit concluded that the "contractual agreement" may have been so much boilerplate, a reduction of an agreement in place; at a minimum, the court held, it was not possible to deduce from the letter that the parties were not bound.

■ Both *Reprosystem* and *Computer Systems* apply the objective approach to intent used by Wisconsin. Both allow the parties to control the effect of their words. One difference between the cases is the complexity of the transaction. When a large-scale corporate transfer is afoot (as in *Reprosystem*) the court will respect any evidence that only a formal contract binds; when a simple transaction for the lease of a machine is at issue (as in *Computer Systems*) and the more formal agreement appears to be boilerplate, an objective reading of the documents more readily leads to the conclusion that a letter agreement is bind-

ing. Our case is on the *Reprosystem* side of this line.

There are some differences between both *Reprosystem* and *Computer Systems* and our case that make ours an easier one for finding the document to be preliminary rather than binding. One difference is the extent to which the parties informed each other (and the court) of their intent to be bound. In both *Reprosystem* and *Computer Systems* the parties conceded that they intended their "agreement in principle" or letter to contain the definitive terms. In *Reprosystem* there was a press release announcing the deal; in *Computer Systems* both sides conceded that they wanted to be bound. In our case, by contrast, only Walters thought he had a binding contract. Another difference concerns the extent to which the terms of the deal were fixed. In both *Reprosystem* and *Computer Systems* all terms had been established. Nothing of significance was contingent. Here, by contrast, the letter of September 1 contains six "contingent conditions" that call for further inquiry, further performance, further rights of approval. These envision renegotiation or cancellation. This may make all the difference. *Lambert Corp.*, 575 F.2d at 135, extracts this principle from Wisconsin law:

> Even if parties agree, point by point, on all the terms of a contract, if they understand that the execution of a formal document shall be a prerequisite to their being bound there is no contract until the document is executed. On the other hand, if it is agreed that a formal document will be prepared to memorialize a bargain the parties have already made, the bargain is enforceable even though the document has not been executed.

The "formal agreement" called for in the September 1 letter was more than a record of an existing, complete bargain. The arrangement between Skycom and Telstar was not complete, and it never became so. On October 20, 1982, Walters personally sent Telstar a letter proposing new and different terms and referring to the preparation of a final agreement; on November 10 Walters's new attorney sent a letter informing Telstar that Skycom could not

comply with the debt condition and proposing still more new terms about Telstar's payment. Walters does not contend that a jury at trial would hear any evidence other than that before the district court. On the evidence available, a jury could reach but one conclusion about the binding quality of the "agreement in principle" to acquire Skycom's assets. See *Anderson v. Liberty Lobby, Inc.,* —— U.S. ——, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986); *Barker v. Henderson, Franklin, Starnes & Holt,* 797 F.2d 490, 496 (7th Cir.1986).

### III

Although there is no doubt that the parties did not reach a definitive agreement about the sale of Skycom's existing assets, the letter of September 1 contains some immediately effective terms. Walters is to stop negotiating for Sat-Tel. He is to take Skycom off the block and hold it available to Telstar alone. Most important, the letter implies that Walters is to turn the negotiations for Sat-Tel over to Telstar forthwith. He did just that. Telstar took over, with the aid of Walters's attorney Schlegel. Walters helped Telstar acquire the license. Walters says these transactions demonstrate that the letter of September 1 is binding. Telstar replies by reiterating the conditional quality of the letter and observing that WGGO's option had expired, so that Walters had nothing to transfer to Telstar. The district court did not mention the immediately binding provisions in the letter or discuss the effect of the parties' conduct in transferring the Sat-Tel negotiations from Walters to Telstar.

Both the district judge and the parties' appellate briefs approached this case as an all-or-nothing matter. Either every term in the letter is effective or no term is. So Walters points to one term that is unquestionably effective (the one requiring him to take Skycom off the market) and maintains that all terms are binding; Telstar points to the escape clauses in the letter and concludes that no term is binding. The assumption that this is an all-or-nothing matter may have misled everyone.

■ Even when a contract fails to become effective as a whole, particular terms may bind under the doctrine of promissory estoppel. In Wisconsin, as in other states, a promise that is designed to induce commercially reasonable detrimental reliance will be enforced to the extent necessary to compensate the relying party for his injury in relying. *Kramer v. Alpine Valley Resort, Inc.,* 108 Wis.2d 417, 321 N.W.2d 293 (1982); *Hoffman v. Red Owl Stores, Inc.,* 26 Wis.2d 683, 133 N.W.2d 267 (1965). Counts 4 and 5 of the amended complaint aver that Telstar represented, intentionally or negligently, an intent to compensate Walters for turning the Sat-Tel negotiations over to Telstar, and that this representation induced Walters to hand the negotiations over. These counts of the complaint seek compensation for the value of the negotiating position and do not depend on the enforceability of the letter as a contract. The facts suggest that Telstar may have induced Walters to turn over the negotiations and that Walters may have relied in a commercially reasonable way on representations made to him. Whether Walters was injured depends on what would have happened had he not signed the letter of September 1. Perhaps WGGO was already out of the picture, as Telstar says; in that event Walters suffered no detriment from relying on the belief that he had a deal. But the record does not compel these conclusions.

■ Claims of this character usually sound in promissory estoppel. Regardless of label, however, the two counts of the complaint put in issue the question of compensation in the event the letter should be held not binding. The district court did not discuss Counts 4 and 5; plaintiffs have raised them on appeal, although with superficial briefing. The case must be returned to the district court, so that the parties may focus on the claim. Specific performance of the September 1 contract is not the appropriate remedy for any detriment Walters reasonably incurred. We have concluded, after all, that the full agreement is not binding. Any estoppel

concerns Sat-Tel, not Skycom.[2] Whether Walters suffered any injury, and whether the lost profits of the Sat-Tel deal are the right measure of damages, are questions for the district court should it find the other elements of promissory estoppel.

## IV

The district court neglected to discuss counts of the complaint sounding in fraud and civil RICO. The fraud claim is that Telstar induced Walters to drop out of the negotiations, intending never to pay for the forbearance. The RICO claim is based on an assertion that some of the documents went through the mail, turning fraud into a "pattern" of mail fraud.

■ The RICO count is easy to dispatch in light of four cases decided after the district court's opinion. See *Marks v. Forster*, 811 F.2d 1108 (7th Cir.1987); *Elliott v. Chicago Motor Club Insurance*, 809 F.2d 347 (7th Cir.1987); *Morgan v. Bank of Waukegan*, 804 F.2d 970 (7th Cir.1986); *Lipin Enterprises, Inc. v. Lee*, 803 F.2d 322 (7th Cir.1986). These cases hold that a "pattern" of racketeering, an essential ingredient in a RICO case, means predicate acts sufficiently separate in time that they may be viewed as separate transactions. *Lipin* held that fraudulent representations inducing a sale of stock did not a pattern make; so here, with supposedly fraudulent representations leading up to a single contract and the transfer of a single business opportunity (the negotiations for Sat-Tel).

■ The fraud claim is not much more difficult. Fed.R.Civ.P. 9(b) requires fraud to be pleaded with particularity. The pertinent allegation of the amended complaint states: "That in the September 1, 1982 agreement and all negotiations prior and subsequent to said agreement, defendant acted fraudulently without any intent to provide consideration for plaintiffs to forbear from negotiations with Satellite Television, Inc." This does not identify a single statement of Telstar or specify why that statement is fraudulent. It will not do. We therefore need not decide whether Wisconsin law would recognize as "fraud" a false representation that a party intends to close on a contract. A similar claim was rejected in *Reprosystem*, and plaintiffs do not identify any Wisconsin case allowing fraud to take the place of consent as an element of contract. Cf. *Kumpf v. Steinhaus*, 779 F.2d 1323, 1327 (7th Cir.1985) (Wisconsin does not require ethical, as distinct from legally-obligatory, conduct by corporations). The existence of the doctrine of promissory estoppel may explain the lack of an independent doctrine of fraud; we need not pursue the point.

## V

The complaint and amended complaint contained misrepresentations about what Skycom and Walters had, and what they gave up. The complaint filed in state court states that the letter of September 1 committed Telstar "to acquire the contract rights for a micro-wave license in the City of Chicago, that belonged to a corporation solely owned by the plaintiff, Gerald M. Walters, to-wit: the Corporation known as WGGO, Inc." Walters was not the "sole owner" of WGGO; he was at best the equitable owner of stock that belonged to Schlegel. WGGO did not possess any "contract rights for a micro-wave license"; it was at best engaged in negotiations and had defaulted on an opportunity to post earnest money. The complaint also alleges that Walters relied to his detriment "by having WGGO, Inc. assign to the defendant its rights to purchase the aforesaid microwave license". There were no such "rights", and WGGO never assigned anything to Telstar; at best Walters told Schlegel to put Telstar in touch with the principals of Sat-Tel. This complaint was filed in April 1983. The amended complaint, filed in the district court during February 1984, contains six claims. They begin: "Plaintiffs repeat, reallege and in-

2. Walters has not contended that there were other bidders for Skycom and WGGO, and so far as we can tell the promise to stop peddling these firms was costless to Walters. This element of reliance therefore could not be a sufficient reason to force Telstar to acquire and pay for Skycom's assets or hire Walters.

corporate by reference as though fully set forth herein each and every allegation contained in ... their complaint as filed in [state court] as though fully set forth herein." This redundant, repetitious, duplicative, prolix, wordy, overlong legalese reasserts all of the misstatements in the earlier complaint. The amended complaint adds an error. Paragraph 8 of the amended complaint states that Telstar "acted to prevent plaintiffs from negotiating and/or exercising an option to purchase stock which plaintiff [sic] held from Satellite Television". Neither Skycom nor Walters ever held an option; only WGGO had an option—and this "option", which expired before September 1, was a right to negotiate, not an option to purchase at a set price.

The complaint sowed confusion; Telstar spent much of its time in the district court (and here) denying that Walters owned WGGO and that WGGO had contract rights. Lawyers have a tendency to deny, and try to disprove, any false allegation in a complaint, even when the allegation may not be dispositive one way or the other. Plaintiffs do not offer any explanation for putting these untruths in the complaint. The amended complaint appears to violate Fed.R.Civ.P. 11, which requires lawyers to investigate before alleging. Either the lawyers did no investigation or they decided to misstate facts readily knowable.

The best face one can put on the complaint is that the lawyers asserted inferences as if they were facts. Walters could acquire WGGO from Schlegel; therefore Walters "owned" WGGO. WGGO was engaged in negotiations that the lawyers were sure would have succeeded; therefore WGGO had "contract rights", as if the negotiations had been completed. This is impermissible. A lawyer must distinguish a fact from an inference he seeks to press on the court. It is unprofessional conduct to represent inferences as facts. E.g., *In re Kelly*, 808 F.2d 549, 551 (7th Cir.1986); *In re Curl*, 803 F.2d 1004, 1006 (9th Cir.1986); *United States v. Lachman*, 803 F.2d 1080, 1082 (9th Cir.), *cert. denied*, — U.S. —, 107 S.Ct. 586, 93 L.Ed.2d 588 (1986). Misleading representations, whether deliberate or careless, misdirect the attention of other lawyers and the district judge. Lawyers' and judges' time is scarce. It must be applied where needed, not frittered away trying to get at facts that are ready to the hand of the plaintiff's lawyer. The district court did not impose a sanction, and Telstar did not file a cross-appeal seeking one. Because this case must be remanded, the district court may wish to consider the appropriate response to the misstatements in the complaint. (We add for the sake of completeness that the plaintiffs' lawyers on appeal did not represent them in the state court or the district court and are not responsible for any errors in the complaint.)

REVERSED AND REMANDED.

WILL, Senior District Judge, concurring in part and dissenting in part.

I join the court's opinion to the extent that it affirms the district court decision granting summary judgment in favor of Telstar. I write separately because I do not believe there is any valid issue regarding promissory estoppel which warrants a remand, nor do I believe a remand to consider the imposition of sanctions is necessary or appropriate. The parties did not raise either of these issues before this court or the district court and I do not believe this is an appropriate case for us to raise them *sua sponte*. Moreover, I disagree with the majority's disposition of both of these matters on their merits. Accordingly, I dissent from sections III and V of the majority opinion.

An innocent reader of the majority opinion would have no idea that promissory estoppel was not an issue in this case until a panel member interjected it at oral argument in this court. As the majority apparently recognizes, neither the original state court complaint nor the amended complaint filed in February 1984 said anything about promissory estoppel. *Ante*, at 813. Moreover, neither side mentioned promissory estoppel in its briefs to the district court or this court. Clearly, the parties as well as the district court understood the amended complaint as raising the following six

claims only: "(1) breach of contract—specific performance; (2) breach of contract—damages; (3) fraud; (4) misrepresentation; (5) negligent representation; and (6) RICO violations." *Skycom Corp. v. Telstar Corp.*, No. 83–C–0625, slip op. at 2 (E.D. Wis. January 9, 1986).

Given this background, I do not think we are obliged to discuss promissory estoppel, much less to order a remand for consideration of the issue. If some grave injustice would result if we failed to raise the issue ourselves, I might feel differently. But that is not the case. It is quite possible that the plaintiffs' attorneys did not advance a promissory estoppel claim because they perceived, correctly, that the facts would not support it.

More importantly, the majority's estoppel analysis is lacking in substantive merit. As the majority recognizes, WGGO's option with Sat-Tel expired on August 31, 1982. *Ante,* at 812, 819. In addition, WGGO never paid the $10,000 in earnest money that the contract between Sat-Tel and WGGO required as a condition of WGGO obtaining negotiating rights. *Ante,* at 813, 819. Thus, on September 5, when Walters accepted the terms of Telstar's letter, he had no negotiating rights with Sat-Tel that he could possibly transfer to Telstar or anyone else. It was Telstar that put up the $10,000 and conducted the negotiations, all well after August 31 when WGGO's option expired. Finally, as the majority accurately observes, Walters cannot have been injured by his compliance with the term requiring him to take Skycom off the trading block. *Ante,* at 818 n. 2. On these undisputed facts, Walters can hardly be said to have relied in either taking or refraining from taking any action to his detriment. Stated simply, he may have relied, but not reasonably or to his detriment.

The majority, while finding that the September 1 letter was not a contract, nevertheless finds that the letter contained certain "immediately binding provisions" requiring Walters to step out of the Sat-Tel negotiations in exchange for some unde-

fined compensation from Telstar. *Ante,* at 817. One searches the letter in vain, however, for any indication that some of its provisions are to become effective immediately while others must await further action to make them binding. In my view, the majority has it right in section II of its opinion: the September 1 letter was an "agreement in principle," not a formal agreement. Walters, therefore, was not required to put Telstar in touch with Sat-Tel prior to the consummation of the Walters-Telstar agreement, and he was not entitled to compensation if he did.

I am also perplexed as to what relief the majority would have the district court grant even if it could somehow find the essential elements of promissory estoppel. Clearly, it could not find the entire agreement binding and order Telstar to acquire Skycom's assets. Yet this is the injury which Walters and Skycom sustained when Telstar declined to complete the transaction and the relief which they seek in this case.

If the majority believes Walters and Skycom may be entitled to a "finder's fee" for having introduced Telstar to Sat-Tel, this would have to be on the basis that somehow the letter agreement and the parties' conduct imply a contract between them for such a fee, not on the basis of promissory estoppel where the damages are measured by the injury sustained in reliance on the other party's conduct. Reading the letter as a whole, however, it is quite clear that no "finder's fee" was intended. The consideration for Walters' services was to be the purchase of Skycom by Telstar. Walters' promise to turn over the Sat-Tel negotiations was part of a much larger deal, and the deal fell through. The pieces cannot be put back together again.

Though it is ordinarily a sad thing when one who may have provided a service gets no compensation, Walters, it should be recalled, misrepresented his ownership of WGGO and the status of his negotiations with Sat-Tel. Again, this is not a case where equity cries out for relief. Nor do I believe it is an appellate court's function to

suggest a possible, though in this case I believe erroneous, theory on which a party might have proceeded. For all we know, plaintiffs long ago concluded that they could not establish either promissory estoppel or a contractual basis for a "finder's fee" and therefore never raised the contentions rather than risk the imposition of Rule 11 sanctions for making specious claims. In any event, it is clear that the relief they want is for Telstar to acquire Skycom, a relief to which the majority and I agree they are not entitled.

On the question of sanctions—or, in the majority's euphemism, "the appropriate response to the misstatements in the complaint," *ante*, at 819—I would again refrain from ordering what I believe to be an unnecessary remand. Telstar has never requested sanctions and no briefs on the issue have been filed. Though a court may raise the issue *sua sponte*, I do not believe Chief Judge Warren erred when he failed to impose sanctions. The supposed infractions of Rule 11 took place, after all, in his court, not here. Unlike the majority, I assume that if he had deemed the infractions serious, Chief Judge Warren would have taken appropriate action in the first instance.

If the plaintiffs had raised their supposedly specious allegations in this court, we might properly consider sanctions. The supposed defects were in the complaints, however, and the plaintiffs abandoned those positions before they reached this court. Moreover, I find it particularly inappropriate for the majority to order the consideration of sanctions at the same time as it finds possible merit in the plaintiffs' case, at least insofar as it might state a claim for "promissory estoppel."

Nothing is really left to be decided in this case. I would simply affirm the district court's decision and let the case rest in peace.

---

* After preliminary examination of the briefs, the court notified the parties that it had tentatively concluded that oral argument would not be helpful to the court in this case. The notice provided that any party might file a "Statement as to Need of Oral Argument." *See,* Fed.R. App.P. 34(a); Circuit Rule 14(f). No such statement having been filed, the appeal has been submitted on the briefs and record.