993 F.2d 1549
 NOTICE: Seventh Circuit Rule 53(b)(2) states unpublished orders shall not be cited or used as precedent except to support a claim of res judicata, collateral estoppel or law of the case in any federal court within the circuit.
ENERACTIVE GROUP, INCORPORATED, Plaintiff-Appellee, Cross-Appellant,
v.
CAREFREE OF COLORADO, et al., Defendants-Appellants, Cross-Appellees.
 Nos. 92-3735, 92-3787.
 United States Court of Appeals, Seventh Circuit.
 Argued May 14, 1993.
Decided June 3, 1993.
 
 Before BAUER, Chief Judge, and EASTERBROOK and ROVNER, Circuit Judges.
 
 Order
 
 1
 This diversity action for breach of contract has seen extensive pretrial proceedings and a trial on damages. Unfortunately it is not over. The district judge removed a critical issue from the trial, necessitating a remand.
 
 
 2
 In order to abbreviate the exposition, we assume familiarity with the district court's opinions. There is no written contract, although the subject matter is one for which the Uniform Commercial Code requires a writing by the party sought to be bound. The district court nonetheless granted partial summary judgment, concluding that a fax sent by an officer of defendants (collectively, "Carefree") signified agreement on the last outstanding issue of the negotiations, the price. Carefree insists that this fax does not satisfy the UCC because its author, Thomas G. Faludy, had neither actual nor apparent authority to bind Carefree--something plaintiff concedes--and because the fax is a negotiating document rather than an agreement to a legally effective contract. The district court found the fax dispositive, however, because, although the document was the work of Faludy, it was transmitted to Eneractive by Robert G. McBride, Carefree's corporate counsel and a leading figure in the negotiations. The fax thus had McBride's imprimatur, the district court believed, and McBride had the authority to commit Carefree. Although the memo does not speak of final agreement, the district court nonetheless treated it as conclusive against Carefree.
 
 
 3
 It is something of a stretch to say--as was necessary in order to grant summary judgment--that there is no disputed issue of material fact on this subject, when all reasonable inferences are drawn (as they must be) in favor of the party opposing the motion. McBride did not sign the memo that was sent to Eneractive by fax. He made some handwritten corrections of typographical and language errors. One reasonable way to understand this is that McBride was allowing Faludy to make a proposal--one so informal that it went out without being retyped--without committing Carefree to Faludy's terms. Nothing in the memo looks like a promise on behalf of Carefree as an institution.
 
 
 4
 There is a deeper problem: McBride himself lacked authority to bind Carefree. So Faludy testified by deposition; there is no contrary evidence. Eneractive argues, and the district court found, that McBride had apparent authority because he was the leader of Carefree's negotiating team. Again, however, reasonable inferences could go the other way. McBride was a lawyer, not a business manager; lawyers frequently supervise the negotiation of contracts without having authority to commit their firms. Lest there be any confusion McBride sent a letter, dated April 13, 1989, informing Eneractive that he lacked authority to make the final decision: "As we discussed at the end of our meeting [on April 12], we would like to finalize the agreement, obtain final approval of Scott Fetzer management, and be prepared to execute the agreement next week." Scott Fetzer is Carefree's parent company. This letter puts the negotiations in a familiar light. The corporation delegated to a team of negotiators the power to dicker over terms, while reserving to senior managers the power to accept or reject the deal. This is exactly how McBride proceeded. After sending the fax on May 5, 1989, he submitted the package to Ken Semelsberger, the President and Chief Operating Officer of Scott Fetzer. Semelsberger withheld approval, deeming the contract a poor business deal for Scott Fetzer. That is why there was never a formal execution--why Eneractive is relying on a fax from Faludy rather than an executed contract.
 
 
 5
 These circumstances cry out an absence of authority, actual or apparent, in McBride. The district judge disagreed, granting summary judgment to Eneractive on the theory that Eneractive could have assumed that McBride obtained the "final approval of Scott Fetzer management" before sending the fax, and thus had apparent authority--if only because McBride was part of "Scott Fetzer management." Such a conclusion is not an appropriate one on summary judgment, as it depends on indulging all inferences against the party opposing the motion. For example, one reasonable if not compelling inference from the letter of April 13 is that members of the management other than McBride had to approve; otherwise why make a point of this condition? Yet the district judge assumed that McBride was the "management" to which the letter referred.
 
 
 6
 Notice that we do not ask whether Eneractive inferred that McBride had Semelsberger's approval before sending the fax; one side to negotiations cannot bind the other by unilateral conclusions and assumptions. The question is whether Carefree's actions invited such an inference, clothing McBride with apparent authority. Pepkowski v. Life of Indiana Insurance Co., 535 N.E.2d 1164, 1166 (Ind.1989); Kokomo Veterans, Inc. v. Schick, 439 N.E.2d 639, 643 (Ind.App.1982). (Indiana law controls the question whether a contract was formed; if one was formed, Ohio law controls its interpretation.)
 
 
 7
 It is hard to find that Carefree issued such an invitation. As we have stressed, many firms delegate negotiation to persons who cannot give final approval. It would frustrate this common and productive device, and in the end undermine important contracting procedures, if the effort to separate these tasks could be overcome by presuming that the negotiators had obtained all necessary approvals. For then no firm could safely withhold final authority from its negotiators, and the process of negotiation would be more complex. Either senior managers would have to be involved at the outset or the negotiating team would be unwilling to commit anything at all to paper. Neither outcome would promote commerce, which is the ultimate objective of the UCC (not to mention the institution of contract). Cf. Skycom Corp. v. Telstar Corp., 813 F.2d 810, 814-17 (7th Cir.1987).
 
 
 8
 McBride told Eneractive that the approval of Scott Fetzer's management was necessary. That message stripped McBride of apparent authority to close the deal. Nothing that we can see about the manner in which subsequent negotiations were conducted reversed that position; certainly no one could reasonably assume that a fax with McBride's stylistic changes was equivalent to the formal "execution" after managerial approval that McBride said would be necessary. To the contrary, McBride promptly asked Eneractive to send some documents that would be necessary before execution. Eneractive never complied.
 
 
 9
 Carefree has not asked us to direct the district court to enter judgment in its favor. Perhaps other evidence in the record makes apparent authority a debatable issue. Unless there is other evidence favoring Eneractive, however, the district court should enforce the limitations on McBride's authority.
 
 
 10
 Because it is possible that Carefree will remain bound on some other theory, we comment briefly on the damages questions that were resolved at trial, to speed this case on its way to final resolution.
 
 
 11
 We agree with all but two of the district court's conclusions concerning damages. In particular, we agree with the conclusion that Eneractive is not a "lost volume seller." The contract (as we shall now call the papers, because damages are available only if there was indeed a "contract") would have made Carefree the exclusive distributor to the recreational vehicle industry of Eneractive's "Energenius" devices. After Carefree refused to accept the units, Eneractive sold as many as it could--all to the recreational vehicle industry. This is a standard "cover" under the UCC. Eneractive could not have sold any of these units itself had Carefree performed under the contract. It is unnecessary to discuss any of the other damages issues except the two on which we differ with the district judge.
 
 
 12
 1. The contract provided for a price of $520 per unit, plus a royalty of $160 per unit for the first 50 units and $80 per unit thereafter. The district court computed damages by reference to the price, without regard to the royalty, reasoning that "[n]o such payments were to be assessed ... until Carefree sold and received payment for the units" and, of course, Carefree did not sell any units. But by parallel reasoning one could say that there were no damages at all, because in exchange for the base price Eneractive was to provide the Energenius devices, which it never had to supply.
 
 
 13
 That the contract price had two parts does not make it any less a price. Calling a portion of the price a "royalty" makes no difference. Consider three ways to express a price: (a) "$680 per unit for the first 50 units, and $600 thereafter"; (b) "each unit is furnished free of charge, but Carefree shall pay a royalty of $680 per unit for the first 50, and $600 thereafter"; (c) "a base price of $520 per unit plus a royalty of $160 for 50 units and $80 for remaining units". The formulae say the same thing in different words; in computing damages they should be treated as identical.
 
 
 14
 2. The district judge declined to award prejudgment interest, concluding that under Ohio law the bona fide dispute about the quantum of damages prevents such an award. See McKinney v. White Sewing Machine Corp., 32 Ohio 2d 306, 310, 200 N.E.2d 596, 600 (1964); Mahon-Evans Realty, Inc. v. Spike, 33 Ohio App.3d 268, 270, 515 N.E.2d 953, 956 (1986). We agree with this conclusion except with regard to the $70,000 lump sum payment called for by the contract. Eneractive was to receive $100,000 as a form of signing bonus. Of this, $30,000 already had been paid as earnest money (refundable if the deal fell through), and $70,000 was due. If the Faludy fax indeed completed the contract, then Carefree owed Eneractive $70,000 cash on the barrelhead. This was a liquidated sum, on which interest is available under Ohio law. Hook v. Hook, 35 Ohio App.3d 51, 55, 519 N.E.2d 687, 691 (1987). That the damages per Energenius unit remained in dispute does not make the $70,000 less certain for purposes of prejudgment interest. Note, however, that this rationale does not render the $80 or $160 royalty per unit a liquidated sum. We have already explained why "$680 per unit" and "$520 per unit plus another $160 per unit" are the same thing; from this it follows that it would be inappropriate to decompose the price per unit in order to award prejudgment interest on part.
 
 
 15
 The judgment is vacated, and the case is remanded for further proceedings consistent with this opinion. Questions of attorneys' fees, and whether Eneractive must refund the $30,000, shall abide the decision on remand.