In the

# United States Court of Appeals

## For the Seventh Circuit

———————

Nos. 07-2919, 07-3052, 07-3106 & 07-3107

UNITED STARS INDUSTRIES, INC.,

*Plaintiff-Appellee*,

*v.*

PLASTECH ENGINEERED PRODUCTS, INC.,

*Defendant-Appellant*.

JONES DAY,

*Appellant*.

———————

Appeals from the United States District Court
for the Western District of Wisconsin.
No. 06-C-349-C—**Barbara B. Crabb**, *Chief Judge*.

———————

ARGUED APRIL 2, 2008—DECIDED MAY 13, 2008

———————

Before EASTERBROOK, *Chief Judge*, and BAUER and EVANS, *Circuit Judges*.

EASTERBROOK, *Chief Judge*. United Stars Industries sold stainless-steel tubing to Plastech Engineered Products between 2000 and 2005. The firms agreed that the price would be adjusted periodically as the cost of raw materials changed. Steel mills set a basic price covering iron and other common ingredients, such as silicon and car-

bon, plus a surcharge for costly elements that are used in particular alloys. Plastech initially ordered products made from a steel that the parties call 304, which contains chromium and nickel. Later it asked United Stars to use 316L steel, which resists corrosion better. Grade 316L stainless steel contains more nickel than grade 304, plus molybdenum, in addition to chromium.

United Stars changed its price for finished tubing every time the steel mills changed their surcharge for chromium, nickel, or molybdenum. Plastech paid regularly until May 2005, when United Stars sent it an extra bill for roughly $700,000. United Stars told Plastech that for the last 18 months it had been basing bills on the surcharge for 304 steel rather than the higher surcharge for 316L steel. Plastech inquired how the surcharges had been calculated and learned that United Stars passed through the entire cost of raw materials, even though about 9% of the steel that United Stars purchased was lost as waste during the process of forming tubing. Plastech insisted that it had agreed to pay surcharges only for the cost of nickel, not chromium or molybdenum, and had not agreed to pay any part of the steel mills' surcharges for materials that United Stars discarded during manufacturing. By Plastech's calculation, United Stars owed it about $900,000.

Plastech stopped paying for tubing, contending that it was entitled to recoup the $900,000 by setoff. United Stars stopped shipping once Plastech fell into arrears. Meetings to discuss this $1.6 million disagreement led to a compromise in August 2005, or so the district judge found after a bench trial of this diversity litigation. United Stars agreed to give Plastech a credit of about $200,000, spread over several years, and Plastech promised to continue

buying from United Stars as long as it kept the price low. Plastech then submitted new orders, using the newly negotiated price. United Stars resumed shipping and ordered new raw materials (steel mills need orders 12 weeks in advance of delivery).

Plastech went on submitting orders and accepting deliveries until mid-October 2005—but it never paid United Stars another dollar. When the tab had reached $800,000, it told United Stars that it was taking its business to a different vendor. (It had signed a contract with the new vendor in June 2005, without telling United Stars.) United Stars then filed this suit, and the district judge entered judgment in its favor for some $1.3 million, a figure that covers the price of tubing that Plastech did not pay for, interest on that figure, and the loss that United Stars incurred when reselling raw materials that it could not use after Plastech walked away. 2007 U.S. Dist. LEXIS 40958 (W.D. Wis. June 5, 2007). The judge added sanctions against Jones Day, Plastech's law firm, for misconduct. 2007 U.S. Dist. LEXIS 64096 (W.D. Wis. Aug. 27, 2007). Plastech entered bankruptcy after filing its appellate briefs, but United Stars is secured by a supersedeas bond. The bankruptcy court has lifted the automatic stay so that the appeal can be resolved.

According to Plastech, the district judge erred in concluding that a compromise had been reached in August 2005 (though Plastech submitted orders consistent with the new arrangement, and the judge credited testimony that Plastech had agreed orally to the written offer United Stars sent). If there was an agreement, Plastech insists, it dealt only with future prices and not with Plastech's claim that it had been overcharged in years past. The complaint that United Stars filed rested on the

2000 contract and Plastech's later purchase orders; that should have been the sole topic of trial, Plastech believes. Finally, Plastech maintains that the 2000 contract limited its liability for raw materials to steel that it had expressly authorized United Stars to purchase. The district court's opinion does not clearly resolve the parties' dispute about whether all acquisition of the unused raw materials had been authorized in "releases" that Plastech sent to United Stars.

Suppose Plastech is right and that the trial should have been limited to determining whether United Stars calculated surcharges correctly under the 2000 contract plus the purchase orders and releases that Plastech submitted. Plastech thinks that, if the district judge erred, then it own position must be correct. Not at all. If we were to accept Plastech's argument that the dispute was not compromised in April 2005, it still would lose—indeed, the judgment in United Stars' favor would have been even greater (though United Stars has not filed a cross appeal, so the award cannot be increased).

United Stars understands the contract as allowing it to pass through the entire surcharge, while Plastech contends that only the surcharge for nickel could be passed through, and then only for the weight of the delivered tubing. As the district judge remarked when imposing sanctions on Jones Day after trial, although Plastech filed a counterclaim demanding $890,000 for supposed overcharges, it never produced a scrap of evidence to support its position. And because Plastech therefore loses whether or not a binding compromise was struck in August 2005, it is unnecessary to resolve Plastech's challenges.

Plastech does not rely on any particular language in the contract, and when United Stars demanded that Plastech designate a corporate witness to attend a deposition with documents supporting its position and able to describe an audit that Plastech claims to have performed, Plastech produced Scott Ryan, who professed ignorance about the subject and did not supply a single document or recollection. Plastech called Ryan at trial, with the same result: no evidence. Nor does Plastech have evidence of discussions between the parties in 2000 about how surcharges would be handled. It relies on the testimony of Elizabeth Pypa, Plastech's vice-president for purchasing in 2000, about her understanding of the contract's meaning. But Pypa's beliefs do not count because they were not communicated to United Stars during the negotiations. See, e.g., *Skycom Corp. v. Telstar Corp.*, 813 F.2d 810, 814–15 (7th Cir. 1987) (Wisconsin law); *Household Utilities, Inc. v. Andrews Co.*, 71 Wis. 2d 17, 28–29, 236 N.W.2d 663, 669 (1976). So, if the district judge had reached the question whether United Stars was correct in calculating the surcharge, it would have prevailed and won $700,000 on top of the invoice price of the tubing that Plastech accepted and did not pay for. That $700,000 substantially exceeds the (disputed) $264,574 that the judgment included to compensate United Stars for unused raw materials.

United Stars had more going for it than just Plastech's failure to substantiate its own view of the contract. The written documents entitle United Stars to pass on the steel mills' metals surcharges. When Plastech decided to order steel containing molybdenum and extra nickel, it necessarily undertook to pay the higher cost; otherwise United Stars was making it a gift, and it rarely makes

sense to interpret a commercial contract as lopsided. Paying for all of the surcharges likewise was logical. United Stars recovered 100% of the steel's base price from Plastech through the list price of the tubing, even though 9% of the steel is lost in the manufacturing process. Why should things be otherwise with the surcharge, which is a variable component of the steel's price?

If United Stars must buy 110 tons of steel coil in order to deliver 100 tons of steel tubing, it must cover the entire cost of the 110 tons through the price of the tubing in order to stay in business. The structure of this contract is one in which Plastech pays for the raw material, and the final price then compensates United Stars for its value added (turning giant steel coils into steel tubing). Plastech might have been able to get somewhere if it could show that the custom in the trade is that fabricators swallow the surcharges for scrap (as they might if scrap containing valuable metals fetches enough from recyclers), but Plastech did not offer any evidence to that effect—and we know from the district court's handling of the unused-materials question that United Stars was unable to recover the full price of 316L steel even when it was still in the original coils. No more need be said to show that United Stars is entitled to an award at least as high as the judgment.

The remaining question is whether the district judge abused her discretion by requiring Jones Day to pay about $30,000 in sanctions for making unsupported (but costly to defend) contentions during the litigation. Here is the district judge's explanation concerning the counterclaim, which accounts for about ¾ of the sanction.

> Plaintiff is correct in characterizing defendant's counterclaim as baseless. Although defendant al-

leged that plaintiff had overcharged defendant by approximately $890,000, it never produced any evidence that it had a legitimate basis for the claim. At the same time, it used the counterclaim as the basis for discovery requests related to the alleged overcharges.

Although defendant made many requests directed to the overcharges, when it came to its own disclosures, it identified only one employee, Scott Ryan, as having information about them. It told plaintiff that Ryan had performed an "in-depth audit" and was knowledgeable about the alleged overcharges. In fact, at his deposition, Ryan expressed his ignorance of any damages. He denied having ever conducted an audit or even knowing what an "internal audit staff" was. Undaunted, defendant named Ryan as a witness at trial and called him despite his lack of knowledge about the alleged overcharges. It produced no other witnesses to testify about its counterclaim.

Even now, defendant cannot point to any evidence to show that its counterclaim had any kind of foundation. It quotes the testimony of Rodney Turton [Plastech's current vice president for purchasing] that "[W]e had our finance team conduct audits in order to [see] what we were being charged, how much we paid, et cetera, to understand where this disconnect came about," Tr. 2-80: 16–25, but says nothing about the results of the audits.

Defendant argues that plaintiff would have incurred the fees incurred during discovery in any event because it had to prove the terms of the

parties' agreement, "which generally consisted of multiplying an applicable tube weight by an applicable surcharge rate." It asserts that the ultimate questions for plaintiff's claim and defendant's counterclaim were identical (apparently because both related to the calculation of surcharges). This is an ingenious argument but not one that stands up to scrutiny. For plaintiff to explain how it calculated the surcharges took almost no work because it did these calculations regularly. On the other hand, it would have had to engage in extensive efforts to try to understand how and why defendant believed the surcharges to be improper. One can appreciate the difficulty (and futility) of those efforts now that it is clear that defendant itself cannot explain the basis for its belief.

But for this baseless counterclaim the suit could have been resolved without a trial. As a practical matter, all of United Stars' legal expenses are attributable to the counterclaim, though the district judge awarded only $21,754 for the time counsel spent dealing with Ryan's deposition and testimony. That sanction is modest.

The district court invoked 28 U.S.C. §1927 as the basis of sanctions, and Jones Day reminds us that this statute authorizes awards against individual lawyers but not law firms. *Claiborne v. Wisdom*, 414 F.3d 715 (7th Cir. 2005). (*Claiborne* was not called to the district court's attention until after it had ruled, and at oral argument Jones Day abandoned this as a ground for reversal; it does not want the sanctions imposed directly on the lawyers who represented Plastech.) Moreover, §1927 sets a higher standard for sanctions than do other sources such as Fed. R. Civ. P. 11(c)(3), 26(g)(3), and 37(a)(5), (b). See *Kotsilieris v. Chalmers*, 966 F.2d 1181, 1184–85 (7th Cir. 1992); *In re TCI*

*Ltd.*, 769 F.2d 441 (7th Cir. 1985). The judge stated that Rule 11 "is useless in [this] situation because the lack of any foundation for the counterclaim is not obvious to the opposing party early enough in the litigation to make a Rule 11 motion efficacious." This supposes that only a motion by counsel under Rule 11(c)(2) allows sanctions; the judge overlooked Rule 11(c)(3), which allows sanctions on the judge's initiative at any time.

Rule 11(c)(3) is the best foundation for this sanction. The judge found that Jones Day advanced a position that never had any evidentiary support, and thus necessarily could not have been based on a reasonable investigation preceding the counterclaim. Rule 11 also allows the imposition of sanctions on law firms as well as on individual lawyers. (Rule 11(c)(1) was amended in 1993 to depart from *Pavelic & LeFlore v. Marvel Entertainment Group*, 493 U.S. 120 (1989), which had held that sanctions must be assessed against lawyers rather than law firms.) Rule 11(c)(3) requires notice and an opportunity to respond; Jones Day had that opportunity as a result of United Stars' motion. And although Jones Day contends that it conducted the reasonable inquiry required by the Rule, the district court's findings show otherwise. The remaining sanctions, in lesser amounts, also are within the district court's authority under Rule 11, which applies to every motion as well as every pleading. See Rule 11(a). It is unnecessary to analyze these modest sanctions in detail. Appellate review of Rule 11 sanctions is deferential, see *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384 (1990), and the district judge did not abuse her discretion. This is clear enough that it would be pointless to remand just so that the district judge may substitute Rule 11 for §1927. Cf. *Samuels v. Boyle*, 906 F.2d 272 (7th Cir. 1990). Since Rule 11 gives the district judge more

discretion than does §1927, the outcome would be fore-ordained.

AFFIRMED